# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
October 11, 2007 Session

## CHRIS CAGLE v. MARK J. HYBNER, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 04-1248-II    Carol L. McCoy, Chancellor**

---

**No. M2006-02073-COA-R3-CV - Filed July 3, 2008**

---

The plaintiff, a songwriter and recording artist, filed this action against his manager and publisher seeking a declaration that the Exclusive Management Agreement and the Exclusive Songwriter Agreement were invalid and unenforceable due to various alleged breaches of fiduciary duty and breaches of contract. The defendants filed Counterclaims seeking a declaration that the Management Agreement and the Songwriter Agreement were valid, and that they sought to recover damages and attorney's fees. The music publisher additionally sought specific performance of the Songwriter Agreement and an injunction to prevent the songwriter from composing any songs for others until the plaintiff fulfilled his obligation to the publisher. The Chancellor summarily dismissed the plaintiff's Complaint. The Chancellor also summarily ruled that the Management Agreement and the Songwriter Agreement were valid and enforceable, that the plaintiff was in material breach of both agreements. As for the Songwriter Agreement, the Chancellor found that the plaintiff was obligated to compose and deliver to the publisher an additional 76 songs of marketable commercial quality, for which the publisher was granted equitable relief in the form of specific performance as well as injunctive relief, whereby the plaintiff was enjoined from composing any songs for others until the songwriter fulfilled his obligation to the publisher. The defendants were also awarded $737,201 in damages, which included an award of attorneys fees of $171,704. The plaintiff appealed presenting numerous issues. We affirm the Chancellor's decision to dismiss the plaintiff's Complaint. We also affirm the Chancellor's determination that the Management Agreement and the Songwriter Agreement were valid and enforceable and that the plaintiff was in material breach of both agreements for which the defendants are entitled to recover damages. We, however, have determined the Chancellor erred by granting the publishing company extraordinary equitable relief in the form of specific performance and injunctive relief under the Songwriter Agreement. Because of our decision concerning specific performance and injunctive relief, each of which are factors to consider when determining the amount of attorney's fees the defendants may be entitled to recover, we find it necessary to vacate the award of attorney's fees in the amount of $171,704 and remand the issue, along with the issue of damages and other relief, if any, to which the defendants may be entitled.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Reversed in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which SHARON G. LEE and ANDY D. BENNETT, JJ., joined.

Jay S. Bowen, Amy E. Neff, and Sarah J. Glasgow, Nashville, Tennessee, for the appellant, Chris Cagle.

Donald S. Engel and Jeffrey Logan, Pro Hac Vice, Atherton, California, for the appellant, Chris Cagle.

Paige Waldrop Mills, Nashville, Tennessee, for the appellees, Mark J. Hybner, Mark Hybner Management, Inc., and Mark Hybner Publishing, Inc.

**OPINION**

In 1994, Christopher (Chris) Cagle moved from Texas to Nashville to pursue a career as a songwriter and recording artist. Approximately a year after moving to Nashville, Cagle entered into a management and publishing agreement with Caliber Music[1]; however, his dreams of quickly becoming a country music star were soon met with the sobering realities of the seemingly impenetrable music industry. Over the next two years, Cagle became disenchanted by the decidedly disinterested reception he was receiving from the Nashville music industry and with an overall lack of success while under contract with Caliber Music.

In the summer of 1998, Cagle met music executive Mark Hybner through a mutual friend. Cagle was immediately impressed with Hybner, and Hybner soon came to believe that Cagle may have the makings of a possible "superstar" and expressed a willingness to become Cagle's manager if and when Cagle was contractually available. Hoping to find greener pastures with the assistance of Hybner, Cagle terminated his contract with Caliber Music in the fall of 1998 and pursued a relationship with Hybner.[2] Although the two did not enter into a formal management agreement until November of 1999, it is undisputed that Hybner took Cagle under his wing in the fall of 1998 and began serving as Cagle's unofficial "personal manager." By December of 1998, Hybner began providing money to Cagle to "keep his lights on and pay his rent" so Cagle could continue writing songs and pursue a career in music. In April of 1999, Hybner arranged for Cagle to record several "demos" of songs he had written in an attempt to secure contracts with record labels and publishing companies.

Thereafter, on November 10, 1999, Cagle entered into an Exclusive Management Agreement (hereinafter "Management Agreement") with Mark Hybner Artist Management, Inc., (hereinafter "Hybner Management"). It is undisputed that Cagle had the benefit of the independent advice and counsel from entertainment attorney Ken Krause to represent him throughout the negotiations of the

---

[1] Cagle entered into a management and publishing agreement with Caliber Music in 1995 or 1996.

[2] Hybner testified that he helped Cagle terminate his prior contract. "I think the first time he asked me for [a publishing deal] he was still in another publishing deal, but that was – *we got rid of that*." (emphasis added).

Management Agreement and that Krause negotiated on Cagle's behalf certain modifications in the Management Agreement prior to Cagle entering into the agreement.

The Management Agreement provided, *inter alia*, that Hybner Management would provide the personal services of Mark Hybner, who would serve as Cagle's exclusive manager, act as his advisor, supervise his professional engagements, and advise and counsel Cagle on matters related to his career during the five year term of the agreement.[3] In consideration for its management services, Hybner Management would be paid twenty percent (20%) of Cagle's gross earnings. As with most management agreements, Hybner reserved the right to engage in business activities and transactions that did not involve Cagle. The clause reads, "It is expressly understood and agreed by [Cagle] that Manager may be engaged in other business activities which may or may not conflict with [Cagle's] career." Conversely, the Management Agreement prohibited Cagle from signing any agreement relating to recording, production, merchandising, songwriting or music publishing without the prior consent of Hybner Management.

Three weeks after Cagle entered into the Management Agreement with Mark Hybner Artist Management, Inc., Cagle entered into an Exclusive Songwriter Agreement with Mark Hybner Publishing, Inc. Unlike the Management Agreement, Cagle was not represented by and did not seek the advice of an attorney prior to signing the Songwriter Agreement with Hybner.

The Exclusive Songwriter Agreement (hereinafter "Songwriter Agreement") required that Cagle render his "exclusive services" as author, composer, arranger, and adapter of musical compositions to Hybner Publishing for the term of the contract.[4] As is customary in such agreements, Cagle assigned unto Hybner Publishing all musical compositions and related works written, composed or arranged by Cagle during the term together with all copyrights therein, including renewals and extensions, and Hybner Publishing agreed to pay Cagle fifty percent of any and all gross receipts derived from the use of Cagle's compositions and fifty percent of any and all gross receipts derived from mechanical, synchronization, performance and all other uses of the compositions.

The Songwriter Agreement contained a minimum writing requirement along with an "Advances" provision. Pursuant to the minimum writing requirement, Cagle was to author eighteen songs[5] a year for each year of the contract, and Cagle was to deliver no less than the minimum writing requirement not later than thirty days prior to the expiration of each year of the contract. In the "Advances" paragraph of the agreement, Hybner Publishing agreed to pay Cagle an advance of

---

[3] The Management Agreement granted Hybner an initial term of two years, plus three consecutive unconditional one-year options, to manage Cagle, and all three options were timely exercised.

[4] The Songwriter Agreement bound the parties to an initial term of three years and allowed Mark Hybner Publishing, Inc., to extend the Agreement for a period of two years after the initial term, both of which were timely exercised.

[5] If he co-wrote a song with another writer, he would receive a one-half credit. If he co-wrote a song with two other writers, he would receive a one-third credit.

$2,500 per month for the first three years of the contract, and $3,000 per month for each of the last two years. The agreement expressly stated that the advances were deemed "nonreturnable advances" and were "recoupable" from any royalties otherwise payable to Cagle.

On July 1, 2000, Cagle entered into a recording contract with a major record label, Virgin Records.[6] Linda Edell Howard, an experienced entertainment attorney, represented Cagle in the negotiations with Virgin Records. Mark Hybner was not directly involved in the negotiations of Cagle's recording contract; however, Ms. Howard called Hybner to obtain his approval of the final draft of the contract before Cagle entered into the contract with Virgin Records.

Not long after Cagle had entered into the recording contract with Virgin Records, Cagle's relationship with Hybner, and others, began to deteriorate. The first cold breeze blew when it was discovered that the "controlled comps" provision in his recording contract with Virgin Records conflicted with a provision in the Songwriter Agreement with Hybner Publishing. In the Songwriter Agreement, Cagle had agreed to a composition rate at "the statutory rate" but in the recording contract with Virgin Records, Cagle had agreed to a reduced rate of seventy-five percent of the statutory rate, known as the "controlled comps" provision. Virgin Records insisted that Cagle and Hybner abide by the "controlled comps" provision in the recording contract between Cagle and Virgin Records.

When the conflict was discovered by Virgin Records, it notified Cagle and Hybner Publishing and informally requested that Hybner Publishing agree to license the songs to Virgin Records at the reduced rate. When Hybner declined Virgin Records' informal request, Virgin Records sent a letter to Hybner and Cagle stating that Cagle was in material breach of the recording contract, and therefore, Virgin Records would withhold royalties payable to Cagle until the breach was cured. Cagle then called upon his attorney, Linda Edell Howard, who had represented Cagle in negotiating the contract with Virgin Records, to plead with Hybner to license the songs to Virgin at seventy-five percent of the statutory rate. Following discussion with Howard, Hybner agreed to reduce the rate. As a result, Cagle and Hybner Publishing entered into an amendment to the Songwriter Agreement to that effect.

Another problem arose after Cagle entered into a Production Agreement with Crime Scene Productions, Inc.[7] Cagle entered into an agreement with Crime Scene Productions to obtain the services of an accomplished producer, Robert Wright. Pursuant to the agreement, Crime Scene Productions agreed to provide the services of Robert Wright to produce Cagle's first two albums for Virgin Records. As was the case with the recording contract, Cagle received independent advice and counsel from Linda Edell Howard, who represented Cagle and negotiated the terms of the production agreement with Crime Scene Productions. In fact, Howard drafted the production agreement the

---

[6]Throughout the negotiations surrounding the recording contract, Linda Edell Howard, an experienced entertainment attorney, advised and represented Cagle. Ms. Howard, however, did not represent Cagle in any respect with regard to the Songwriter Agreement with Hybner Publishing.

[7]Linda Edell Howard represented Cagle with respect to his producer agreement with Crime Scene Productions, Inc.

parties signed. Only two people signed the production agreement. Cagle signed the production agreement to bind himself to the agreement. For its part, the production agreement was signed on behalf of Crime Scene Productions, Inc., by Mark Hybner as the "authorized signatory" of Crime Scene Production, Inc. The agreement also provided that all notices to Crime Scene Production, Inc. would be sent to its offices on 17th Avenue South in Nashville, and that copies of all notices to Crime Scene Productions, Inc., would also be sent to "Mark Hybner" at his address in Shiner, Texas.

After the first album was released, Cagle and Hybner agreed that Cagle would receive ten percent of Hybner Publishing's "publisher's share" of royalties for songs or parts of songs appearing on the second album provided that Cagle's writing credits for the songs on the second album totaled no less than forty percent of all of the songs on the album. One of the songs scheduled to be released on the second album was *I'd Be Lying*, a song Cagle claimed he had written alone, in which event he would receive 100% of the writing credit. Prior to the release of Cagle's second album, however, David Banning, a songwriter who had co-written some songs with Cagle, claimed that he was entitled to half of the writer's credit for *I'd Be Lying*. Although Cagle insisted that Banning contributed nothing to help Cagle write the song, Cagle consulted with Hybner who advised Cagle to give Banning a share of the songwriter credit to avoid a protracted and costly dispute, which Cagle proceeded to do. After the album was released, Cagle requested ten percent of the publisher's share pursuant to his agreement with Hybner; however, he was advised that he did not qualify because he did not have forty percent of the "writer's content" on the album. It was then that Cagle realized that sharing the writing credit with Banning caused Cagle's "writer's content" to fall below the forty percent threshold needed to earn ten percent of the publisher's share. Cagle subsequently accused Hybner of breaching a fiduciary duty to Cagle by failing to explain the consequences of the infringement claim prior to agreeing to settle the dispute with Banning.

In April of 2004, Cagle sent Hybner notice that he was being discharged as Cagle's manager. Immediately thereafter, Cagle filed this action in the Chancery Court for Davidson County against Mark Hybner individually, Mark Hybner Management, Inc., and Mark Hybner Publishing, Inc. (collectively "Defendants"). In the Complaint, Cagle seeks damages for breach of contract and breach of fiduciary duty and a declaration that the Management Agreement and the Songwriter Agreement are unenforceable. Defendants filed an Answer denying that Cagle was entitled to any relief. They also filed a Counterclaim seeking a declaration that the Management Agreement and the Songwriter Agreements were valid, specific performance of the agreements, and damages from Cagle, including attorney's fees.

Following discovery, Defendants moved for summary judgment seeking dismissal of Cagle's claims and judgment on their Counterclaim. Following a hearing, the Chancellor granted Defendants' motion for summary judgment, ruling that the agreements were valid and enforceable, and that Cagle was obligated under the Songwriter Agreement to compose and deliver to Mark Hybner Publishing another 76.52 songs of marketable commercial quality. The Chancellor also awarded Defendants $737,201 in damages, which included an award for attorneys' fees and costs. This appeal followed.

**STANDARD OF REVIEW**

-5-

The issues were resolved in the trial court upon summary judgment. Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). This court must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we first determine whether factual disputes exist. If a factual dispute exists, we then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

Summary judgments are proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd v. Hall*, 847 S.W.2d at 210; *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001); however, they are not appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. The party seeking a summary judgment bears the burden of demonstrating that no genuine disputes of material fact exist and that party is entitled to judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d at 695. Summary judgment should be granted at the trial court level when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion, which is the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001). The court must take the strongest legitimate view of the evidence in favor of the non-moving party, allow all reasonable inferences in favor of that party, discard all countervailing evidence, and, if there is a dispute as to any material fact or if there is any doubt as to the existence of a material fact, summary judgment cannot be granted. *Byrd v. Hall*, 847 S.W.2d at 210; *EVCO Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975). To be entitled to summary judgment, the moving party must affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

## ANALYSIS

Cagle presents numerous issues for our review on appeal. We have determined that all of the issues need not be addressed and, therefore, we will address the issues we deem dispositive of this appeal.[8] We will first analyze whether Hybner owed a fiduciary duty to Cagle prior to November of 1999, when Cagle and Hybner executed the Management Agreement and, if so, whether there are material facts in dispute concerning the validity of the Management Agreement.

<u>Whether Hybner Owed Cagle a Fiduciary Duty Prior to Executing the Management Agreement</u>

---

[8]Cagle asserted sixteen issues on appeal. For the reasons stated above, we find it unnecessary to address each issue as presented.

Cagle contends the Chancellor erred in its determination that the Management Agreement was valid and enforceable. This contention is based in principal part upon Cagle's assertion that Hybner had voluntarily assumed a fiduciary role as Cagle's personal manager *prior to* entering into the formal, written Management Agreement, by assuming the fiduciary role prior to the time the Management Agreement was entered into, Hybner had a heightened burden of proof to establish the fairness of the Management Agreement. The Chancellor, however, found that Hybner did not owe Cagle a fiduciary duty, and further concluded that the only duties Hybner owed Cagle arose out of the contracts between them. Specifically, the Chancellor stated, "I keep coming back to any duty that Mr. Hyber had to Mr. Cagle arises out of the contract. He had no fiduciary duty."

It is undisputed that Hybner was acting as Cagle's personal manager for several months prior to executing the Management Agreement in November of 1999. In fact, Hybner admitted that he was acting as Cagle's personal manager, stating unequivocally in his deposition that he was providing "management services" to Cagle prior to entering into the Management Agreement. Cagle also testified that Hybner was serving as his "manager" prior to the signing of the Management Agreement. It is also undisputed that Hybner took Cagle "under his wing" in the fall of 1998, and by December of 1998 began providing money to Cagle. By April of 1999, Hybner had arranged for Cagle to write and record a number of "demos" for the purpose of shopping them to record labels and publishing companies to secure contracts for Cagle as a recording artist and songwriter.[9]

A noted treatise provides us with an insight into the fiduciary role of a manager or agent of an artist in the music industry. It instructs that the artist-personal manager relationship is one of principal-agent due to the fact "the artist hires the manager to develop and promote the artist's career, the manager agrees to use his special knowledge and experience in the entertainment industry on the artist's behalf, and the artist has the ultimate authority to ratify the manager's decisions. *See* Hal I. Gilenson, Badlands: Artist-Personal Manager Conflicts of Interest in the Music Industry, 9 Cardozo Arts & Ent. L.J. 501, 519 (1991). It further instructs that:

> An agent's agreement to act on behalf of the principal creates a fiduciary duty in the agent in favor of the principal. The concept of a fiduciary relationship is rather amorphous, having no fixed definition. In general, the "fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another."

*Id.*

The treatise goes on to instruct that the "fiduciary relationship" exists when "one party confides to another the management of some business to be transacted in the former's name or on his account, and by which such other assumes to do the business and render an account of it." *Id*. Whether there exists such a relationship, however, "is dependent on a manifestation of the

---

[9]Hybner recalled having shopped the demos for Cagle before they entered into any written agreement.

principal's intent that the agent act on his behalf, the agent's acceptance of the duty to act, and the understanding that the principal has control over the relationship." *Id.*

In Tennessee, the relation of principal and agent is a trust relation. *Judds v. Pritchard,* No. 01A01-9701-CV-00030, 1997 WL 589070, at * 5 (Tenn. Ct. App. Sept. 24, 1997) (citing *McNeill v. Dobson-Bainbridge Realty Co.*, 195 S.W.2d 626, 629 (Tenn. 1946)). An agent is simply "[o]ne who undertakes to transact some business, or to manage some affair, for another, by the authority and on account for the latter, and to render an account of it." *Id.* (citing *Security Federal Sav. & Loan Ass'n of Nashville v. Riviera, Ltd.*, 856 S.W.2d 709, 715 (Tenn. Ct. App.1992) (quoting *Miller v. Insurance Co. of North America*, 366 S.W.2d 909, 911 (Tenn. 1963)). "Whether an agency has been created is to be determined by the relations of the parties as they in fact exist under their agreements or acts. *Id.* If relations exist which will constitute agency, it will be an agency, whether the parties understood it to be or not." *Id.* (quoting *Kerney v. Aetna Cas. & Surety Co.*, 648 S.W.2d 247, 252-53 (Tenn. Ct. App. 1982)).

Based upon the undisputed facts and the legal principles set forth above, we have concluded that Hybner was serving as Cagle's personal manager prior to the execution of the Management Agreement. Accordingly, as Cagle's manager, Hybner owed Cagle the fiduciary duty of good faith and fair dealings. We, therefore, respectfully disagree with the Chancellor's determination that Hybner did not owe Cagle a fiduciary duty.

The law in Tennessee regarding transactions between persons occupying a fiduciary relationship is well stated in the opinion of *Roberts v. Chase*, 166 S.W.2d 641, 650-51 (Tenn. Ct. App. 1942). The pertinent sections of the opinion are as follows:

> The fiduciary relation may be of any kind which implies confidence, as trustee and beneficiary, attorney and client, . . . confidential friend and adviser, indeed, any relation of confidence between persons which gives one dominion or influence over the other. *Bayliss v. Williams*, *supra*; *Miller v. Proctor*, *supra*. Speaking of a transaction between parties to a fiduciary relation Mr. Pomeroy says: "While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity, raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption." Vol. 3, p. 790.

> The presumption of invalidity extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party. *Trusts and Trustees*, by Bogert, Vol. 3, § 493, p. 1566. The strength of the presumption varies according to the circumstances of each particular case. Where the fiduciary deals directly with his principal, the presumption of invalidity is rebuttable. . . .

If the transaction purported to be one for a consideration, the burden rests upon the fiduciary to show that the consideration was adequate. *Trusts and Trustees*, by Bogert, Vol. 3, § 493, p. 1568. *The circumstances of some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is by showing that his principal had the benefit of independent advice.* BRISPHAM'S PRINCIPALS OF EQUITY, 10th Ed., p. 399; *Miller v. Proctor*, *supra*; *Peyton v. William C. Peyton Corp.*, Del.Sup., 7 A.2d 737, 123 A.L.R. 1482, and the cases collected in the annotation, 123 A.L.R. 1505.

*Roberts*, 166 S.W.2d at 650-51 (emphasis added).

The existence of the manager relationship between Hybner and Cagle prior to the execution of the Management Agreement, and the fiduciary responsibilities arising therefrom, places upon Hybner the burden of overcoming the presumption against the validity of the Management Agreement. *See Roberts*, 166 S.W.2d at 650-51. The mere presumption of invalidity does not, however, end our inquiry. To the contrary, as the *Roberts* opinion instructs, Hybner may rebut the presumption by showing, *inter alia*, that Cagle received independent advice before engaging in the transaction. *Id*.

It is undisputed that Cagle received independent advice of counsel from an experienced entertainment lawyer during the deliberations and negotiations leading up to the execution of the Management Agreement. This fact is admitted by Cagle, and it is confirmed by his attorney, Kenneth Krause. Krause testified by affidavit that he reviewed the draft of the management agreement proposed by Hybner at the request of Cagle. Krause went on to state in his affidavit, "After reviewing the draft of the management agreement, I advised Cagle regarding the agreement's terms and negotiated on Cagle's behalf certain modifications to the management agreement."

Although there is no such thing as a standard management agreement between an artist/songwriter and manager, there is no evidence in the record to support a finding that the Management Agreement signed by Cagle is onerous, oppressive or "unfair" to Cagle. Moreover, the record reveals that Cagle did not question the validity of the Management Agreement until he sent his notice to terminate Hybner in April of 2004, four and one-half years after the Management Agreement was entered into by Cagle. Further, and significantly, Cagle had the independent advice and counsel of an experienced entertainment lawyer prior to entering into the management Agreement. But for Cagle's mere conclusory assertions that the Management Agreement is not fair to Cagle, which do not constitute evidence, Cagle has failed to present evidence sufficient to create a dispute of fact as to the validity of the Management Agreement when it was entered into in 1999. We, therefore, affirm the Chancellor's ruling that the Management Agreement was valid and enforceable.

### Hybner's Roles and Responsibilities Under the Management Agreement

The Management Agreement expressly provides that Hybner was hired "to represent [Cagle] to render services to [Cagle] as [Cagle's] sole and exclusive personal Manager, representative, and advisor throughout the world, in all of [Cagle's] business affairs in the entertainment and literary

fields." The Agreement went on to explain that Hybner had the right to act as Cagle's advisor in all business negotiations and matters of policy, that he could supervise Cagle's professional engagements, and he would advise and counsel Cagle on matters concerning employment, songwriting, selection of theatrical and booking agencies, and all other matters relating to Cagle's professional activities and career. The Agreement further provided that Hybner could appoint others to assist him provided "Mark Hybner oversees same at all times." Further, and significantly, Hybner was "irrevocably appointed" as Cagle's "true and lawful agent and attorney-in-fact" with express authority to "engage, discharge and direct" for Cagle attorneys and accountants in connection with Cagle's business and financial affairs, approve and permit the use of Cagle's name and likeness, act as Cagle's negotiator with respect to agreements regarding Cagle's services, execute in Cagle's name agreements for Cagle's services in connection with live engagements, and collect payments and endorse Cagle's name upon and cash any payments to Cagle for his services.

With the execution of the Management Agreement on November 10, 1999, Hybner became (1) the agent, (2) manager, (3) confidential advisor, and (4) attorney-in-fact for Cagle concerning a broad spectrum of his business and financial affairs. Hybner's various roles automatically carried with them certain legal and fiduciary duties. In the absence of a choice of law provision, the law of Tennessee would dictate Hybner's legal and fiduciary duties. Cagle and Hybner, however, expressly agreed that the Management Agreement "shall be interpreted and construed" in accordance with the laws of the State of Texas.

*An Agent's Fiduciary Duties Under Texas Law*

In Texas, an agency relationship creates a fiduciary relationship as a matter of law. *Sassen v. Tanglegrove Townhouse Condominium Ass'n*, 877 S.W.2d 489, 492 (Tex. App.-Texarkana, 1994) (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex.1992); *Locke v. Thigpen*, 353 S.W.2d 249 (Tex. Civ. App.-Houston 1961), *rev'd on other grounds*, 363 S.W.2d 247 (Tex. 1963); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509 (1942); Restatement (Second) of Agency Ch. 13 (1958); 3 Tex.Jur.3d Agency § 113 (1980)). The Texas courts instruct that "a fiduciary relationship exists when the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation." *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980) (citations omitted). The Texas courts also tell us that the appointment of an attorney-in-fact creates an agency relationship which, as a matter of law, creates a fiduciary relationship. *Sassen,* 877 S.W.2d at 492.

The Supreme Court of Texas has stated that the general fiduciary duty of an agent to his principal is "to act solely for the benefit of the principal in all matters connected with his agency." *Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007) (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002) (quoting Restatement (Second) of Agency § 387 (1958)). Texas courts have also held that an agent, as a fiduciary, owes its principal "a high duty of good faith, fair dealing, honest performance, and strict accountability" and if the agent fails to fulfill its duties, the agent will be liable to its principal for the resulting damage. *Sassen*, 877 S.W.2d at 492 (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002); Restatement (Second) of Agency § 401 (1958)).

Therefore, with his appointment as Cagle's agent, manager, confidential advisor, and attorney-in-fact, Hybner owed Cagle the fiduciary duties of an agent within the scope of the agency relationships created by the Management Agreement and in transactions connected with the agency relationship, which include the duties to act solely for the benefit of Cagle in all matters connected with his agency and the duty of acting in good faith, fair dealing, and honest performance. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700-02; *see also Sassen*, 877 S.W.2d at 492.

*Did the Management Agreement Relieve Hybner of His Fiduciary Duties*?

By express provision in the Management Agreement, it was agreed that Hybner may be engaged in "other business activities which may or may not conflict with [Cagle's] career." Hybner contends the foregoing provision nullifies any fiduciary duties he may otherwise have owed Cagle. We respectfully disagree finding the provision merely limited the extent of the agency relationship, not the fiduciary duties owed concerning transactions connected with the agency relationship.

The "existence and extent" of the duties of the agent to the principal are determined by the terms of the agreement between the parties. *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 703; *see also* Restatement (Second) of Agency § 376 (1958). By expressly reserving the right to engage in "other business activities" which may conflict with Cagle's career, Hybner limited the extent of the agency relationship. As explained earlier, the general fiduciary duty of an agent to his principal is to act solely for the benefit of the principal in all matters "connected with his agency." *Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700 (quoting Restatement (Second) of Agency § 387). Because the agency relationship did not extend to "other business activities,"or stated another way "business activities with others," Hybner owed no fiduciary duty to Cagle concerning those business activities. That, however, does not nullify or limit the fiduciary duties Hybner owed Cagle concerning transactions and business activities connected with the agency relationship between Hybner and Cagle. To the contrary, Hybner owed Cagle the duty of acting in good faith, fair dealing, and honest performance in all transactions connected with the agency relationship. *See Nat'l Plan Adm'rs, Inc.*, 235 S.W.3d at 700-02; *see also Sassen*, 877 S.W.2d at 492.

The Alleged Breaches of Hybner's Fiduciary Duty

Cagle alleged that Hybner breached his fiduciary duty by (1) advising Cagle to execute the Songwriter Agreement without the benefit of legal counsel, (2) misrepresenting Cagle's position to Virgin Records regarding the controlled compositions and placing Hybner's interests over Cagle's regarding the dispute with Virgin Records, (3) inducing Cagle to use Crime Scene Productions without disclosing Hybner's interest in that company, and (4) failing to inform Cagle of the conflict of interest concerning a percentage of the publisher's royalties in the second album. The Chancellor summarily dismissed each of these claims. Cagle insists that material facts were in dispute and, therefore, the Chancellor erred by dismissing the claims. We will examine each in turn.

*The Exclusive Songwriter Agreement*

Cagle contends the Songwriter Agreement is unenforceable due to Hybner's breach of his fiduciary duties. Specifically, Cagle contends Hybner breached his fiduciary duty by advising Cagle

to execute the Songwriter Agreement and a subsequent Amendment without the benefit of legal counsel and failing to inform Cagle of the conflict of interest created by the Songwriter Agreement and the non-standard song requirement in the agreement.

Three weeks after entering into the Management Agreement, and thus, at a time when Hybner was serving as Cagle's agent, manager, confidential advisor, and attorney-in-fact, Cagle entered into a Songwriter Agreement with Mark Hybner's publishing company. The Songwriter Agreement states that the publishing company is "Mark Hybner Publishing, Inc." It is, however, undisputed that Mark Hybner Publishing, Inc., was not incorporated at the time the parties entered into the Songwriter Agreement.[10] Thus, the parties to the agreement were Hybner and Cagle.

The Chancellor ruled that the Songwriter Agreement was valid and enforceable against Cagle. This ruling was based in part on the Chancellor's determination that Hybner did not owe Cagle a fiduciary duty and on the Chancellor's determination that Cagle knowingly waived the right to have counsel when he signed the Songwriter Agreement. In her ruling on this issue, the Chancellor stated:

> As to the allegation that Mr. Hybner breached a fiduciary duty to Mr. Cagle by advising him to sign the Exclusive Songwriter Agreement without benefit of counsel, Mr. Cagle's claim is barred by the Parol Evidence Rule. Mr. Cagle acknowledged his right to secure counsel and that he knowingly waived that right when he signed the agreement. He cannot alter the terms of the contract under which [he] obligated himself to perform. Mr. Cagle is charged with knowing the terms of the agreement that he entered into, including Exclusive Songwriter Agreement and the Exclusive Management Agreement. Mr. Cagle's testimony without benefit of counsel directly contradicts the written contract that he signed. Accordingly, the proffered testimony is barred by the Parol Evidence Rule and, because the record reveals no other evidence that would support his claim, it fails as a matter of law.

As discussed earlier, whether Cagle had the advice of counsel is a factor to be considered; however, it is not the only relevant factor to be considered. Moreover, the Songwriter Agreement does not state that Cagle had the advice of counsel prior to entering into the Songwriter Agreement. It merely states that Cagle had been *advised* of his *right* to retain counsel and he *either* retained and had been represented by counsel *or* "knowingly and voluntarily waived [his] right to such legal counsel."[11] In fact, it is undisputed that Cagle did not have an attorney review the Songwriter

---

[10]As was the case with Mark Hybner Management, Inc., Mark Hybner Publishing, Inc., was not incorporated at the time it entered into the Publishing Agreement.

[11]The provision in the Songwriter Agreement stated the following:

**Legal Counsel**

**COMPOSER HEREBY REPRESENTS AND WARRANTS THAT COMPOSER HAS BEEN ADVISED OF COMPOSER'S RIGHT TO RETAIN INDEPENDENT LEGAL**

(continued...)

Agreement or render any advice to him concerning the merits of the proposed contract prior to entering into the Songwriter Agreement with Hybner.

Whether Cagle knowingly waived his right to counsel or was induced by Hybner to not retain counsel is a disputed fact. Cagle testified that Hybner encouraged him to not retain counsel, stating that Hybner told him, "You do not need to waste your money on an attorney for this contract. I'm a fair man; I will treat you right." Although Hybner does not admit giving Cagle that advice, Hybner admits he never advised Cagle to seek independent review of the Songwriter Agreement by an attorney and states that he "assumed" Cagle had an attorney review the Songwriter Agreement. We also find it significant that Hybner asked two artists to speak to Cagle to vouch for Hybner's character and abilities, which they did, but they also encouraged Cagle to not hire an attorney to review the proposed agreement. One of the artists, Mark Tracy, testified in his deposition that he and fellow artist Rob Wright spoke to Cagle at Hybner's request. Tracy explained that he recommended to Cagle that he not hire an attorney to review the contract because Hybner would "most likely" not change anything in the contract.

We also note there is a dispute of fact concerning whether Hybner sufficiently informed Cagle that the terms of the Songwriter Agreement were or were not consistent with industry standards as it pertained to the minimum writing requirements – twelve songs a year versus eighteen songs a year – and whether Cagle should have received additional compensation or credit toward the minimum writing requirements for assigning the copyrights to twenty-four songs Cagle had written prior to the commencement of the term of the Songwriting Agreement.

Generally, an agent has a duty not to deal with his principal as "an adverse party in a transaction connected with the agency relationship," Restatement (Third) of Agency § 8.03; however, an agent may deal with the principal as an adverse party in a transaction connected with the agency under certain circumstances. *See* Restatement (Third) of Agency § 8.06. Section 8.06 of the Restatement, which was adopted by Texas, states that an agent may deal with the principal as an adverse party *provided* the principal consents to the transaction *and* in obtaining the principal's consent, the agent: (1) acts in good faith; (2) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them; and (3) otherwise deals fairly with the principal. *See also Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942) (holding it is the duty of a fiduciary to deal openly, and to make full disclosure to the party with whom he stands in such relationship). Therefore, Hybner could deal with Cagle as an adverse party concerning the Songwriter Agreement provided Cagle consented to the transaction *and* in obtaining Cagle's consent, Hybner acted in good faith; disclosed all material facts he knew, had reason to know, or should have known would reasonably affect Cagle's judgment – unless Cagle manifested that such facts are already known by

[11](...continued)
**COUNSEL IN CONNECTION WITH THE NEGOTIATION OF THIS AGREEMENT AND THAT COMPOSER HAS EITHER RETAINED AND BEEN REPRESENTED BY SUCH LEGAL COUNSEL OR HAS KNOWINGLY AND VOLUNTARILY WAIVED COMPOSER'S RIGHT TO SUCH LEGAL COUNSEL.**

Cagle or Cagle does not wish to know them; and Hybner otherwise dealt fairly with Cagle in the transaction. *See Kinzbach Tool Co.*, 160 S.W.2d at 513; *see also* Restatement (Third) of Agency § 8.06.

Considering the foregoing, we find material facts in dispute concerning whether Hybner fulfilled his fiduciary duties to disclose all material facts and to otherwise deal fairly with Cagle as Cagle was considering whether to enter into the Songwriter Agreement with Hybner. This finding would normally preclude summary judgment on the issue of the validity of the Songwriter Agreement; however, Hybner asserted a statute of limitations defense to this claim. In pertinent part, Hybner insists that Cagle was advised by his business manager, Mark Hendricks, in 2000 that the eighteen song minimum writing requirement per year was a non-standard provision, which is more than three years prior to the filing of this action. With the statute of limitations for breach of fiduciary duty being three years, Hybner contends the claim is barred. We agree.

One is deemed to have discovered the right of action if and when he is aware of facts sufficient to put a reasonable person on notice that he has suffered an injury as a result of wrongful conduct. *Terry v. Niblack*, 979 S.W.2d 583, 586 (Tenn. 1998) (citations omitted). The statute of limitations for a claim of breach of fiduciary duty is three years, Tenn. Code Ann. § 28-3-105, and such an action must be brought within three years from the time the plaintiff discovered the alleged wrong. *Keller v. Colgems EMI Music, Inc.*, 924 S.W.2d 357, 361 (Tenn. Ct. App. 1996).

In *Keller v. Colgems EMI Music, Inc.*, the plaintiff, Jack Keller, a professional songwriter, sued the defendant publishing companies claiming a breach of fiduciary duty by fraudulently failing to disclose the contents of an amendment to an agreement Keller signed in 1960.[12] The breach of duty allegedly was discovered in 1988, and the dispositive issue in that case was whether the three-year statute of limitations or the six-year statute applied. The complaint was filed by Keller in 1994. This court held that the three-year statute applied and affirmed the trial court's action in dismissing the complaint as time barred.[13]

The relevant facts of that case are as follows. Keller signed an agreement with Aldon Music, Inc., on November 5, 1959, to perform various services as a songwriter, producer, and performer. The contract contained "Exhibit B" which obligated Aldon "to counsel [Jack Keller] as to contracts for his professional work . . . to make the professional career of [Keller] the success contemplated, both professionally and financially, and in general . . . endeavor to the best of [Aldon's] ability to forward the interests of [Keller]. *Id*. at 358. The contract also contained an "Exhibit A" which was crossed out by the parties, which would have allowed Aldon:

> to secure copyright registration and protection of said works at your own cost and expense and at your election, including any and all renewals of copyright to which I may hereafter become entitled, and to have and to hold said copyrights and all rights of whatsoever nature thereunder existing, for and during the full terms of all said copyrights and all renewals and extensions thereof. It is hereby agreed that one-half of the general advance royalty payable to me under paragraph 4(k) of this agreement is in consideration of the grant by me of said renewals of copyright and the rights existing thereunder.

*Id*. at 359. In 1960, Keller signed an amendment to the 1959 agreement reinstating Exhibit A. In the action Keller filed in 1994, Keller claimed that Don Kirshner, a co-owner of Aldon, told him the only effect of the amendment would be to enable Keller to produce other artists for an increased royalty rate. *Id*. Keller also claimed that he signed the amendment only after relying on the misstatements of his personal manager Aldon Music. *Id*. Keller allegedly discovered the amendment's provision governing copyright renewal rights in 1988, which he maintained was "when the first composition copyrighted under the 1959 agreement between himself and Aldon became

[12]Jordan Keller, to whom a part of the contract rights had been assigned, joined his father as plaintiff.

[13]In our analysis of the issue, whether the three-year statute of limitation for injuries to personal property found in Tenn. Code Ann. § 28-3-105 applied to bar the plaintiffs' claims as the defendants insisted, we stated that "regardless of whether a complaint sounds in contract, if the suit seeks to recover damages for injuries to the plaintiff's property, the applicable limitations period is three years as found in Tenn. Code Ann. § 28-3-105." *Id*. (citing *Alexander v. Third National Bank*, 1994 WL 424287, at *3 (Tenn. Ct. App. 1994)). We also explained that "we determine the gravamen of the complaint by looking to the basis for which damages are sought" and that the basis of the plaintiffs' damages "were tortious in nature, specifically breach of fiduciary duty, and fraudulent misrepresentation." *Keller*, 924 S.W.2d at 361. Upon those facts and principles, the court concluded the three-year statute of limitations governed, explaining that "an economic loss, as in the case before us, which is a consequence of property damage is within the three-year statute found in Tenn.Code Ann. 28-3-105." *Id*.

subject to renewal." *Id*. At that time EMI Music Publishing, Inc., ("EMI") which had acquired Aldon Music, informed Keller that he did not have the right to renew the copyrights. The breach of fiduciary claim was based on the assertion the defendants failed to disclose the contents of a contract amendment signed in 1960. Because Keller allegedly discovered the problem in 1998, but failed to file suit until 1994, this court determined his claim was barred by the statute of limitations.

The statute of limitations is generally tolled during the period of time the plaintiff has no actual knowledge of the injury and, as a reasonable person, would not be placed on inquiry notice, *see Potts v. Celotex Corp.*, 796 S.W.2d 678, 680-81 (Tenn. 1990); however, a plaintiff is not permitted to delay filing suit until all the injurious effects or consequences of the alleged tortious conduct are fully known. *See John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 533 (Tenn. 1998).

The issue of whether the plaintiff exercised reasonable care and diligence in discovering the injury or wrong is usually a fact question. *Wyatt v. A-Best Co.*, 910 S.W.2d 851, 854 (Tenn. 1995); *McIntosh v. Blanton*, 164 S.W.3d 584, 586 (Tenn. Ct. App. 2004). Where, however, the undisputed facts demonstrate that no reasonable trier of fact could conclude that the plaintiff did not know, or in the exercise of reasonable care and diligence should not have known, that he sustained an injury as a result of the defendant's wrongful conduct, dismissal of the complaint is appropriate. *Schmank v. Sonic Automotive, Inc.*, No. E2007-01857-COA-R3-CV, 2008 WL 2078076, at *3 (Tenn. Ct. App. May 16, 2008) (citing *Roe v. Jefferson*, 875 S.W.2d 653, 658 (Tenn. 1994) (affirming summary judgment where "no reasonable trier of fact could find that [plaintiff] Roe was unaware that she had suffered an injury for purposes of the discovery rule"); *Stanbury v. Bacardi*, 953 S.W.2d 671, 677-78 (Tenn.1997) (affirming dismissal of complaint where plaintiff held to have been "aware of facts sufficient to put a reasonable person on notice that she had suffered an injury" despite plaintiff's assertion that she did not discover her claim until later)).

Here, it is undisputed that Cagle was informed in 2000 by his business manager, Mark Hendricks, that the minimum writing requirement in the Songwriter Agreement was not standard and that Cagle was required under the contract to do more than most songwriters.[14] Thus, it is undisputed that Cagle knew, or should have known, in 2000 that he had suffered an injury as a result of Hybner's alleged failure to disclose the fact the Songwriter Agreement was not standard. Cagle, however, did not file suit to contest the validity of the Songwriter Agreement until 2004, more than three years after discovering the alleged breach of fiduciary duty. Accordingly, Cagle's claim to declare the Songwriter Agreement invalid due to Hybner's alleged breach of fiduciary duties at the time the parties entered into the Songwriter Agreement in 1999 is barred by the statute of limitations.

Finding no dispute of a material fact, we therefore conclude, as a matter of law, that Cagle's claim that the Songwriter Agreement is invalid is barred by the statute of limitations, and that Mark

---

[14]The trial court found that Hendricks advised Cagle in 1999; however, it is undisputed by the parties that in the summer of 2000, Cagle engaged Mark Hendricks to serve as his business manager, and it is undisputed that at sometime near the beginning of their engagement, Hendricks advised Cagle of the non-standardness of the eighteen-song requirement provided for in the Songwriter Agreement. Thus, the advice did not occur until 2000.

Hybner and Mark Hybner Publishing, Inc., are entitled to summary judgment concerning the validity of the Songwriter Agreement.

*Virgin Records and the Controlled Compositions Clause*

Cagle claims that Hybner breached a fiduciary duty by failing to inform Cagle or Cagle's attorney who was negotiating the proposed Virgin Records agreement, that the "controlled comps" provision in that agreement would conflict with the corresponding provision in Cagle's Songwriter Agreement with Hybner. We find no merit to this claim because Cagle did not sustain any damages as a result of the alleged breach.

The conflict arose when Cagle discovered that the "controlled comps" provision in his new recording contract with Virgin Records conflicted with Cagle's Songwriter Agreement with Hybner Publishing. Subsequent to entering into the Songwriter Agreement with Hybner Publishing, Cagle entered into a record contract with Virgin Records. In the first agreement, Cagle agreed that Hybner would be entitled to the "full" or "statutory" composition rate; however, in the subsequent agreement Cagle entered into with Virgin Records, Cagle agreed to a "controlled compositions" provision by which the composition rate to be paid by Virgin Records would be substantially less that the full or statutory rate to which Hybner Publishing was entitled to receive for Cagle's compositions. The rate in the Virgin Records contract was seventy-five percent (75%) of the statutory rate.

When Virgin Records first notified Cagle and Hybner that it would not pay in excess of the "controlled comps" rate set forth in its contract with Cagle, Hybner declined to give in to Virgin Records' demands. Soon thereafter, however, after Linda Edell Howard, Cagle's attorney who had represented him in negotiating the Virgin recording contract, intervened to seek an amicable solution, Hybner agreed to amend the Songwriter Agreement so that it would not conflict with Cagle's commitment to Virgin Records. Accordingly, Cagle suffered no damages from Hybner's conduct with respect to the controlled compositions provision in the Virgin Records contract.[15] In the absence of damages, Cagle has no claim.

*The Agreement with Crime Scene Productions, Inc.*

Cagle contends Hybner breached his fiduciary duty by failing to disclose that he had an adverse interest prior to Cagle entering into the production agreement.[16] We find two significant problems with this claim. One, Cagle was ably represented by attorney Linda Edell Howard throughout the negotiations of this contract, thus he had independent advice of counsel concerning the merits of the agreement. Moreover, it was known to his attorney that Hybner had an interest in

---

[15]Cagle admitted that his goodwill with Virgin Records was not damaged. Moreover, it was Hybner, not Cagle, who absorbed the reduction in royalties associated with the controlled compositions provision.

[16]Pursuant to the agreement, Crime Scene Productions was to furnish the services of a talented producer, Robert Wright, under a loan-out agreement, to produce Cagle's first two albums for Virgin Records. The contract documents indicated that Crime Scene Productions was organized as a loan-out company to "furnish the services of Robert Wright" to produce recordings.

Crime Scene Production, that pursuant to the contract, Hybner was to be sent copies of all notices to Crime Scene Productions, and that Hybner executed the contract as the "duly authorized representative" of Crime Scene Productions. Two, Cagle has presented no facts upon which to conclude that he sustained any damages as a result of this agreement. To the contrary, the evidence reveals that the album produced by Crime Scene Productions for Cagle went "gold."

Thus, the trial court correctly determined that the defendants were entitled to summary judgment on this issue.

*Co-Writing Interest in "I'd Be Lying"*

Cagle also contends that he was deprived of ten percent of the publisher's share of royalties for the second album as a consequence of a breach of fiduciary duty by Hybner. We find no merit to this rather novel claim.

After the first album was released, Hybner and Cagle agreed that Cagle would receive ten percent of the publisher's share of royalties for songs written by Cagle on the second album, *provided* that Cagle's writing credits for the second album totaled no less than forty percent of all of the songs on the album.[17] Cagle's writer's credits on the second album, however, did not total forty percent, and thus, Cagle did not qualify for or receive any portion of the publisher's share of the royalties.

Prior to the release of Cagle's second album, David Banning, a songwriter who had worked with Cagle, claimed that he was a co-writer of the song, *I'd Be Lying*, which was on Cagle's soon to be released second album. Although Cagle insisted that Banning contributed nothing to the song, Cagle, following Hybner's advice to settle the claim that could be protracted and costly, agreed with Banning to share the songwriter credit. The decision to share the songwriter credit with Banning reduced Cagle's total credits on the album. After the album was released, Cagle learned that his "writer's content" on the second album was less than the forty percent threshold required to receive ten percent of the publisher's royalties.

Cagle contends that Hybner breached a fiduciary duty by not "doing the math" so-to-speak, meaning that he did not advise Cagle that he would not have sufficient writers's credits to earn the ten percent of the publisher's share of the royalties if he settled the infringement claim. We, however, are unable to conclude that this alleged failure constitutes a breach of a fiduciary duty. As we discussed earlier, Hybner may deal with Cagle in "a related transaction" provided Hybner acted in good faith, dealt fairly with Cagle in the transaction, and disclosed all material facts he should have known would reasonably affect Cagle's judgment *unless* Cagle had manifested that such facts are already known by Cagle. *See* Restatement (Third) of Agency § 8.06. When Cagle settled with Manning, Cagle knew which songs were to be on the album, and he additionally knew which of those songs he had written or co-written and which were written by other songwriters. Accordingly, Hybner did not conceal a material fact from Cagle. Moreover, it appears that Cagle simply failed

---

[17]Pursuant to their agreement, Cagle received credit for writing and co-writing the songs on the album.

to recognize the significance of the transaction. Nevertheless, the fact Hybner did not do the math or counsel Cagle concerning the math, without more, is insufficient to conclude that Hybner breached a fiduciary duty.

Alleged Breaches of the Management Agreement

Cagle contends that Hybner breached the Management Agreement by failing to act in Cagle's best interests on numerous occasions, and failing to act in good faith and that the Chancellor erred by granting summary judgment in favor of Hybner with regard to Cagle's claims. We find no merit to these claims.

The Chancellor dismissed the breach of contract claim stating the breaches alleged by Cagle are "do not amount to breaches of the contracts." The Chancellor also stated,

> The record does not reflect that Mr. Hybner or the other Defendants were ever given any notice by Mr. Cagle of any alleged problem pursuant to this contractual provision, other than the Virgin Records situation, nor was Mr. Hybner ever given any opportunity to cure any alleged problem. When Mr. Hybner was given notice of the Virgin Records problem, he promptly cured that problem and no damages resulted to Mr. Cagle.

The contract provision referred to by the Chancellor is paragraph 9.01 of the Management Agreement, which provides:

> No breach of this Agreement on the part of Manager or Artist shall be deemed to be material, unless the party alleging the breach shall have given notice of such breach to the alleged breaching party, and such party shall fail to cure such breach within thirty (30) days after receipt of such notice.

With the exception of the "controlled comps" provision in the Virgin Records agreement, which claim has been resolved, it is undisputed that Cagle never gave Hybner notice of any alleged breach. The Management Agreement expressly provides that no breach on the part of Hybner shall be deemed to be material, unless Cagle shall have given notice of such breach to Hybner. Without notice of the alleged breach, Hybner cannot be held to have breached the agreement. Accordingly, as the Chancellor correctly held, the defendants are entitled to summary judgment on these claims because Cagle failed to give notice pursuant to the express notice provision in paragraph 9.01 of the Management Agreement.

Hybner's Equitable Remedies Under the Songwriter Agreement

We now turn our attention to the equitable relief awarded Hybner pursuant to the Songwriter Agreement.

The Chancellor granted Hybner's prayer for specific performance of the Songwriter Agreement ordering Cagle to "compose and deliver" to Hybner Publishing 76.52 songs that are due

-19-

and owing under the Songwriter Agreement. The Chancellor also enjoined Cagle from writing songs for others until the contractual obligation was satisfied, stating:

> Mr. Cagle shall only write songs, under his name or any other name, for Mark Hybner Publishing until he has tendered the remaining 76.52 songs of marketable commercial quality that are due to Mark Hybner Publishing under the Parties' Agreements.

Cagle contends the trial court erred by compelling Cagle to specifically perform the Songwriter Agreement and by enjoining him from writing songs for others until he has fulfilled his obligation to compose and deliver the additional 76.52 songs. We agree with Cagle on both issues and shall deal with them in turn.

### *Choice of Law Under the Songwriter Agreement*

Unlike the Management Agreement, which selected the law of Texas, the Songwriter Agreement expressly provides that the validity, construction and effect of the Songwriting Agreement and any modifications shall be governed by the laws of the State of Tennessee.[18] We will, therefore, analyze the issues raised concerning the Songwriter Agreement pursuant to the law of Tennessee.

### *Specific Performance*

Hybner's prayer for specific performance is based on two provisions in the Songwriter Agreement. One, is the minimum writing requirement pursuant to which Cagle was obligated to compose and deliver eighteen songs a year during each year of the term for a total of ninety songs. Cagle composed and delivered a fraction of the total, only 13.48 songs. The other provision upon which Hybner relies to contend he is entitled to specific performance is the following:

> Composer acknowledges and agrees that Composer's services hereunder and the products thereof are unique and extraordinary, the loss of which would cause Publisher irreparable harm for which no adequate remedy at law exists. Composer acknowledges that Publisher, in addition to all other available rights and remedies, shall be entitled to injunctive and other equitable relief to enforce this agreement in the event of Composer's breach or threatened breach hereof.

Although Cagle is clearly in default of his obligation to compose and deliver 90 songs, for which Hybner is entitled to recover damages, we have concluded that Hybner is not entitled to specific performance. This is because the court cannot effectively enforce the agreement due to the fact an essential term, whether the songs are of marketable commercial quality, is subject to Hybner's "sole discretion." Moreover, specific performance is inappropriate because it would be contrary to the concept of equity to compel Cagle to exclusively render his personal services to

---

[18]The choice of law is expressly stated in the amendment to the Songwriting Agreement.

Hybner for the period of years necessary to fulfill Cagle's obligation to compose 76.52 new songs. This is particularly repugnant to equity due to the fact loyalty and confidence have dissipated, and Cagle cannot fulfill his obligations absent Hybner's discretionary approval of his creative services.

The Songwriter Agreement at issue is a personal service contract. Generally, a personal service contract will not be specifically enforced by an affirmative decree. Restatement (First) of Contracts § 379 (1932) (stating "a promise to render personal service or supervision will not be specifically enforced by an affirmative decree"). There is, however, a limited exception to the rule. The primary exception allowing specific performance of a personal service contract is confined to instances where the performer possesses "unique and exceptional skill or ability in his area of expertise," *see Pingley v. Brunson*, 252 S.E.2d 560, 561 (S.C. 1979); nevertheless, a "contract for the performance of unique personal services is normally unenforceable." *Howard R. Greenhouse, Architect, Inc. v. State, Dep't of Corr.,* Civ. A. No. 5551, 1978 WL 22029, at *1 (Del. Ch. March 14, 1978). For a personal service contract to be specifically enforceable due to the uniqueness of the services involved, "the performance due the party seeking specific performance . . . must be unique"; otherwise it is not enforceable due to the fact the remedy at law is considered adequate. *Id.*

Although the parties agreed that the services to be rendered by Cagle are unique and extraordinary,[19] the loss of which would cause Hybner irreparable harm for which no adequate remedy at law exists, and that Hybner is entitled to injunctive and other equitable relief, their agreement does not entitle Hybner to the extraordinary equitable relief of an injunction or specific performance of the agreement. To the contrary, such extraordinary relief is not appropriate unless *the court* can determine that the contract is "clear, definite, complete and free from any suspicion of fraud and unfairness." *Johnson v. Browder*, 207 S.W.2d 1, 3 (Tenn. 1947).

> If the contract has all the essentials of validity, and *is certain in its terms*, is based on an adequate and valuable consideration, is fair and just in all its provisions, is free from any fraud, misrepresentation, illegality, or mistake, *is capable of being enforced without hardship to either party*, and if compensation in damages for its breach would be inadequate, a bill will be maintained for its specific performance.

*Shuptrine*, 597 S.W.2d at 730 (quoting Gibson's Suits in Chancery, 5th Ed., p. 237, Vol. 2) (emphasis added). Thus, the personal services required of Cagle must be of "a reasonable degree of definiteness and certainty, so that *the court* may not only know what to order but also *be able to determine whether or not the resulting performance is in accord with the contractual duty*. Restatement (First) of Contracts § 370 cmt. c (emphasis added). Accordingly, the parties' agreement notwithstanding, specific performance will not be decreed "unless the terms of the contract are so

---

[19] The parties stated in the Songwriter Agreement that Cagle's songwriting services were unique, however, there is little if any material evidence upon which to conclude that the future services Cagle owes Hybner would be unique. To the contrary, Hybner would merely increase his publishing catalogue by an additional 76.52 songs, and there is nothing unique about that. The dispute under the Songwriter Agreement between Hybner and Cagle is more about money than unique services, the potential revenue to be earned from the additional 76.52 songs to be written by Cagle. Damages for the breach of a personal service contract is generally an adequate remedy. *See New River Lumber Co. v. Tenn. Ry. Co.*, 191 S.W. 334, 340 (Tenn. 1916); *Shuptrine v. Quinn*, 597 S.W.2d 728, 730 (Tenn. 1979).

-21-

expressed that *the court can determine with reasonable certainty what is the duty of each party and the conditions under which performance is due.*" *Id*. (emphasis added). As one of the comments to § 370 explains, "there may be cases in which it is just to refuse the remedy of specific performance on the ground of uncertainty, even though it is not unjust to give a judgment for damages or restitution." *Id*. cmt. b.

The Chancellor ordered Cagle to "compose and deliver" to Hybner Publishing the 76.52 songs that are due and owing under the Songwriter Agreement. The Songwriter Agreement expressly provides that each of the 76.52 songs to be composed by Cagle must be a new and original music composition of "marketable commercial quality." Whether a song meets this criteria is to be determined by Mark Hybner, in his "sole discretion." Thus, the only criteria concerning the sufficiency of Cagle's future performance is Mark Hybner's subjective opinion. Such "criteria" – Hybner's sole discretion – does not satisfy the condition precedent that the contract provide "clear" and "definite" criteria for the fulfillment of the services to be performed. *See Johnson*, 207 S.W.2d at 3. Moreover, as we learned from the Restatement, the personal services required by the contract must be of "a reasonable degree of definiteness and certainty, so that *the court* is *able to determine whether or not the resulting performance is in accord with the contractual duty*." *See* Restatement (First) of Contracts § 370 cmt. c (emphasis added). The Songwriter Agreement does not provide sufficient definiteness and certainty to enable the court to determine whether any of the future songs composed by Cagle constitute a new and original music composition of marketable commercial quality. Because the court would not be able to determine whether Cagle's future performance is in accord with his contractual duty, specific performance of Cagle's duty to author an additional 76.52 songs is not appropriate.

We have additionally concluded that specific performance is not appropriate for another reason. Specific enforcement will generally not be decreed "if the performance is of such a character as to make effective enforcement unreasonably difficult or to require such *long-continued supervision by the court as is disproportionate to the advantages to be gained from such a decree and to the harm to be suffered in case it is denied*." Restatement (First) of Contracts § 371. Artists are among the many varieties of personal service contracts to which the rules of specific performance apply. Restatement (First) of Contracts § 379 cmt. c (1932). Others include, without limitation, actors, singers, athletes, teachers, cooks, and personal custodians of children.[20] *Id*. The common thread among these types of relationships is that the contracts create an intimate relation, the performance is personal service, and it involves personal supervision. *Id*. As is stated in the Restatement, the general rule is that "a promise to render personal service or supervision will not be specifically enforced by an affirmative decree." *Id*. Factors to be considered when determining whether to grant or deny such a decree include, but are not limited to, "the existence of a personal relationship like that of master and servant, the difficulty of enforcement, the difficulty of testing the

---

[20]Among the many varieties of personal service contracts to which the rule of Section 379 applies are those requiring performance as an actor, a singer, a sales-agent, a ball-player, a teacher, a mechanic, a valet, a cook, a railway gate-tender, a personal custodian of children. Among the contracts that are included are all contracts of employment creating the intimate relation of master and servant; the latter's performance is personal service and that of the former frequently involves personal supervision. Restatement (First) of Contracts § 379 cmt. c (1932).

quality of the performance actually rendered, and the length of time that the promised performance will require." *Id*. cmt. b.

Considering the last factor stated above, the length of time Cagle's performance will require would likely span four or more years.[21] The idea of compelling a close personal association over a protracted period of time after disputes have arisen and loyalty and confidence dissipated has been deemed repugnant by courts facing the situation. *Pingley*, 252 S.E.2d at 560. The refusal to compel specific enforcement in these cases is based in part "upon the difficulty of enforcement and of passing judgment upon the quality of performance, and in part upon the undesirability of compelling the continuance of personal association after disputes have arisen and confidence and loyalty are gone." Restatement (First) of Contracts § 379 cmt. d (1932). As the authors of the Restatement explain it, compelling a person to render personal services under such circumstances for a period of time "would seem like the enforcement of an involuntary servitude." *Id.*

*Injunctive Relief*

Although injunctive relief may be deemed appropriate when specific performance is not, this is not one of those cases. *See Fletcher v. Rachou*, 323 So.2d 163, 167 (La. App. 3 Cir. 1975). A promise to render personal service exclusively for another will not be enforced by injunction against serving another person if its probable result will be to compel a performance involving personal relations the enforced continuance of which is undesirable. Restatement (Second) of Contracts § 367 (1981). In the present matter, if Cagle is enjoined from writing songs for anyone other than Hybner until Cagle has composed and delivered 76.52 songs Hybner determines, in his sole discretion, to be of commercially marketable quality, then Cagle may forever be enjoined from songwriting or may be forced into involuntary servitude to Hybner for years. Such a circumstance places Hybner in a position of overwhelming power, which we find to be unfair, and thus, inequitable.

We have, therefore, concluded that the injunction which prohibits Cagle from writing songs for anyone other than Hybner until Cagle has tendered the remaining 76.52 songs of marketable commercial quality will likely force Cagle to endeavor to perform the contract, the specific performance of which we have already found to be inequitable and unenforceable. Accordingly, Hybner is not entitled to injunctive relief as granted by the trial court.

The Attorney's Fee Award

The Chancellor assessed $171,704 of Hybner's attorney's fees against Cagle. The award of attorney's fees was based on the express provision in the Management Agreement that the prevailing party shall be entitled to recover its reasonable attorney's fees in the event of litigation. Cagle concedes the fact the prevailing party is entitled to recover its reasonable and necessary attorney's

---

[21]The record reveals that the industry standard is for a songwriter to compose twelve commercially marketable songs a year. The Songwriter Agreement required Cagle to compose and deliver eighteen songs a year. He delivered less than fourteen songs during the term of the agreement. If Cagle composed eighteen songs a year, and assuming eighteen songs were approved by Hybner a year, it would take four additional years for Cagle to fulfill his composition obligation to Hybner.

fees; however, he contends that Hybner did not provide any proof of the reasonableness of the fees. We find this contention to be without merit.

The Chancellor conducted a hearing for the purpose of determining Hybner's damages. Three weeks prior to the hearing, Hybner submitted a list of witnesses it planned to present at the hearing along with a fee affidavit from Hybner's counsel concerning his fee request. When the matter came on for hearing, Cagle requested that the court hold a separate fee hearing at a later date to consider the attorney's fee issue. The Chancellor refused to delay the hearing or to separate the issues, stating that Cagle should have conducted discovery concerning the reasonableness of the attorney's fees prior to the hearing. The Chancellor also noted in its order that there had been sufficient time for Cagle to make the necessary inquiries as to the reasonableness of the attorney's fees prior to the hearing on damages. The Chancellor also found that Hybner's proof was sufficient to support an award of attorney's fees in the amount of $171,704.

When the parties' contract provides that the prevailing party is entitled to reasonable attorney's fees to enforce their contract, the prevailing party is entitled to recover its reasonable attorney's fees. *Albright v. Mercer*, 945 S.W.2d 749, 750 (Tenn. Ct. App. 1996) (citations omitted). In such a circumstance, the trial court has no discretion regarding whether to award attorney's fees; however, determining the amount of the attorney's fee that is reasonable is within the trial court's discretion. *Airline Constr. Inc. v. Barr*, 807 S.W.2d 247, 270 (Tenn. Ct. App. 1990).

The prevailing party has the burden to make out a prima facie claim for his request for reasonable attorney's fees. *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn. 1988); *In re Estate of Perlberg*, 694 S.W.2d 304, 309 (Tenn. Ct. App. 1984). The party requesting the attorney's fees is not required to call witnesses to testify to prove the reasonableness of the requested fees. This is because trial courts are capable of applying the relevant factors and deciding whether a requested fee is reasonable based on the court's knowledge of the case and the court's perception of the value of the services performed. *Wilson Mgmt. Co.*, 745 S.W.2d at 873; *Preston Lincoln-Mercury, Inc. v. Kilgore*, 525 S.W.2d 155, 158 (Tenn. Ct. App. 1974).

Instead of calling witnesses to testify at a hearing or by deposition, the prevailing party may present the affidavit of the lawyer or lawyers who performed the work. *Hennessee v. Wood Group Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991). A party opposing the request is to be afforded a fair opportunity to cross-examine the requesting party's lawyer and to present proof of its own. *Kahn v. Kahn*, 756 S.W.2d 685, 696 (Tenn. 1988) (citations omitted); *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. Ct. App. 1992).

The reasonableness of requested attorney's fees depends on the facts of each case, *Fell v. Rambo*, 36 S.W.3d 837, 853 (Tenn. Ct. App. 2000); *Alexander v. Inman*, 903 S.W.2d 686, 695 (Tenn. Ct. App. 1995). Reasonableness determinations should be guided by the applicable factors. *White v. McBride*, 937 S.W.2d 796, 800 (Tenn. 1996); *Connors v. Connors*, 594 S.W.2d 672, 676-77 (Tenn. 1980). The time expended and the hourly rate charged are only two of the many factors influencing the reasonableness of a particular fee. *United Med. Corp. of Tenn., Inc. v. Hohenwald Bank & Trust Co.*, 703 S.W.2d 133, 136 (Tenn. 1986). Other factors include the nature of the services rendered, the novelty and difficulty of the issues involved, the skill required to perform the

services properly, the results obtained, and the experience, skill, and reputation of the attorney performing the services. *Connors*, 594 S.W.2d at 676.

In this matter, Cagle complains that the trial court erred by denying his request for a continuance on the day of the hearing and for awarding fees of $171,704 based solely on the affidavits of Hybner's counsel. Because of our decisions to reverse the trial court for granting specific performance and the additional injunctive relief, each of which are substantial issues in this case and necessarily were factors for the trial court to consider when determining the amount of attorney's fees to which Hybner was entitled as the prevailing party, we must remand the issue of damages and such other relief, if any, to which Hybner may be entitled. Moreover, our decisions may necessitate further proceedings in the trial court for which both parties may incur additional attorney's fees and our decision may have an impact on the extent to which Hybner is the prevailing party and the amount of attorney's fees he is entitled to recover. Accordingly, we vacate the award of attorney's fees and remand this issue for further proceedings consistent with this opinion without prejudice to the rights of either party to seek attorney's fees to which that party may be entitled and/or to contest the amount of attorney's fees sought by the other party.

## In Conclusion

We therefore affirm the dismissal of the Complaint filed by Chris Cagle. We affirm the judgment of the Chancellor holding the Exclusive Management Agreement valid and enforceable and the judgment holding the Exclusive Songwriter Agreement valid and enforceable. We vacate the orders granting specific performance against Chris Cagle and the injunction against Chris Cagle. With the exception of the award of attorney's fees, we affirm the damages awarded against Chris Cagle. As for the award of attorney's fees, we vacate the award and remand the issue of attorney's

for a new determination of the attorney's fees to which Mark Hybner Artist Management, Inc., and Mark Hybner Publishing, Inc., may be entitled. Costs of appeal are assessed to Appellant Chris Cagle.


                                        _____

                                        FRANK G. CLEMENT, JR., JUDGE