**NATIONAL PLAN ADMINISTRA-TORS, INC. and CRS Marketing Agency, Inc., Petitioners,**

v.

**NATIONAL HEALTH INSURANCE COMPANY, Respondent.**

No. 05–0006.

Supreme Court of Texas.

Argued Feb. 16, 2006.

Decided Sept. 28, 2007.

---

Douglas W. Alexander, J. Woodfin Jones, Dana Livingston Cobb, Alexander Dubose Jones & Townsend LLP, Robert J. Kleeman, Munsch Hardt Kopf & Harr, P.C., Darryl Wayne Pruett, Hall & Kleeman PLLC, Austin, Kevin H. Dubose, Alexander Dubose Jones & Townsend LLP, Houston, TX, for Petitioner.

William L. Kirkman, Bourland & Kirkman, Thomas M. Michel, Griffith, Jay, Michel L.L.P., Fort Worth, Robert M.

O'Boyle, Strasburger & Price, LLP, Austin, TX, for Respondent.

Larry J. Taylor, Ray Stocks, Bruce Barnard, Walt Podgurski, Glenn D. West, for Amicus Curiae.

Justice JOHNSON delivered the opinion of the Court.

National Health Insurance Company, Inc., contracted with National Plan Administrators, Inc. (NPA), for NPA to perform third-party administrator duties for cancer insurance policies issued by National Health. When National Health decided to exit the cancer insurance market, NPA "rolled" most of the cancer policies to Hartford Insurance Company. National Health sued NPA and obtained a jury finding that NPA breached its general fiduciary duty to National Health. We hold that NPA did not owe National Health a general fiduciary duty. We reverse the court of appeals' judgment and render judgment that National Health take nothing.

## I. Background

CRS Marketing Agency, Inc., began marketing individual insurance policies[1] to school district employees in the late 1970s. Through the years, CRS developed its own policy forms and pricing structures. It marketed insurance through agents and earned "override commissions" on the sales. CRS also developed expertise in helping school districts administer insurance and other benefit plans by means of a "common-remitter" program. The CRS common-remitter program was offered through NPA, a corporation wholly owned by CRS. The common-remitter program allowed NPA to offer multiple products to an employer and the employer to offer insurance products and fringe benefits to employees with minimal administrative difficulties. The common-remitter program also allowed NPA and CRS to develop relationships with employers which helped its marketing efforts.

In the late 1980s and early 1990s, CRS marketed cancer policies which were underwritten by American Heritage Life Insurance Company. The relationship between American Heritage and CRS became strained, in part, because some of the independent agents that CRS approached to market the cancer policies were contracting directly with American Heritage and depriving CRS of commissions.

In early 1995, CRS and National Health began discussing the possibility of National Health underwriting CRS's cancer policies. Scott Smith, President and CEO of National Health at the time the agreement with NPA was executed and through the time frame relevant to the lawsuit, told Clyde Sommerlatte, the owner of CRS, he was opposed to "rolling" American Heritage policies to National Health. "Rolling" of policies was described as a process by which a great number of individual policies in force are effectively transferred or rolled from one insurer to another by way of an agent or marketer presenting the new insurer's product and recommending to an employer and insured employees that the existing policies be rewritten with the new insurer. The rolling process can result in less-desirable insureds, such as those with open claims, remaining with the original carrier while other, lower-risk insureds become policyholders with the new carrier.

In the negotiations between NPA and National Health, Sommerlatte made it clear that he wanted CRS products to be

---

1. The policies at first were only cancer policies. The various types of policies will be referred to as "cancer policies" for ease of reference.

sold only through CRS. Negotiations leading up to the contract lasted several months and were conducted at arms length. Both parties received the advice of counsel. National Health and NPA eventually executed an Administrative, Compensation, and Claim Service Agreement (the Agreement). The Agreement provided that CRS-developed insurance products would be marketed exclusively through NPA. The Agreement also stated that NPA "shall act as an independent contractor in the performance of responsibilities formed under this Agreement, and that [NPA's] services are not exclusive to National Health and that [NPA] will provide services to third parties." The rolling practice was not addressed in the Agreement.

After the Agreement was executed in 1995, NPA began administering, and CRS began marketing, cancer policies underwritten by National Health. In 1997, NPA also began administering cancer policies for Hartford Life Insurance Company. The Hartford policies were CRS policies similar to the policies CRS marketed for National Health, but they were not sold to school district employees through the schools. In May 1999, unbeknownst to National Health, NPA and Hartford discussed rolling cancer policies underwritten by both National Health and American Heritage to Hartford. In July 1999, National Health informed NPA that it was going to discontinue underwriting CRS-marketed cancer policies and that National Health had found a buyer to purchase the existing policies (referred to by the parties as a "book of business"). The potential buyer would administer the policies itself instead of using NPA's services. National Health gave NPA ninety days to find a

buyer for the National Health book of business that would allow NPA to continue as administrator.

NPA approached Hartford about purchasing National Health's entire cancer policy book of business. In order for Hartford to evaluate the offer, NPA sent Hartford what National Health contends was confidential information as to National Health's policyholders and premiums. Hartford ultimately declined to purchase National Health's entire cancer book of business, but agreed to offer replacement policies to National Health insureds without requiring evidence of insurability so long as the insureds were "actively at work."

Ultimately, most National Health policies were replaced by Hartford policies. Within a short time in the fall of 1999, the number of NPA-administered National Health policies dropped from approximately 7,000 to approximately 500. The policies of most National Health insureds who were not actively at work remained with National Health; most insureds actively at work switched to Hartford.

National Health sued NPA, CRS, and Hartford.[2] The claims against NPA and CRS included breach of contract, breach of fiduciary duty, fraud, fraudulent inducement, "unfair or deceptive act or practice," misappropriation of trade secrets, and negligent misrepresentation. At trial, the breach of fiduciary duty claim was submitted as follows:

*Question No. 8*

Did NPA fail to comply with its fiduciary duty to [National Health]?

You are hereby instructed that, in its role as [National Health's] third-party

---

**2.** The jury questions as to Hartford were answered in Hartford's favor and the trial court rendered a take-nothing judgment against Na-

tional Health as to Hartford. National Health did not appeal as to Hartford.

administrator, NPA owed National Health a fiduciary duty. To prove that it complied with its duty, NPA must show that:

a. The transaction(s) in question were fair and equitable to [National Health];

b. NPA made reasonable use of the confidence that [National Health] placed in NPA;

c. NPA acted in the utmost good faith and exercised to the utmost scrupulous honesty toward [National Health];

d. NPA placed the interests of [National Health] before its own, did not use the advantage of its position to gain any benefit for itself at the expense of [National Health], and did not place itself in any position where its self-interest might conflict with its obligations as a fiduciary; and

e. NPA fully and fairly disclosed all important information to [National Health] concerning NPA's role as third-party administrator for [National Health].

Answer "Yes" or "No."

ANSWER: _____

NPA objected to this submission, in part, on the basis that the question and instructions inquired about a general fiduciary duty when NPA did not owe such a duty to National Health. The trial court overruled NPA's objection. The jury answered "Yes" and found National Health's damages were $744,937.[3] The jury also

found malice and assessed $100,000 in punitive damages. Based on a jury finding that NPA and CRS were a single business entity, the trial court entered judgment against NPA and CRS jointly and severally for actual and punitive damages.

NPA and CRS appealed. The court of appeals affirmed. 150 S.W.3d 718. The court of appeals concluded that NPA owed a general fiduciary duty to National Health:

> [G]iven the structure of the statutes regulating agents in the insurance industry generally, the scope of the statute regulating third-party administrators in particular, and the details of the written agreement between National Health and National Plan Administrators, we hold that National Plan Administrators generally owed a fiduciary duty to National Health.

*Id.* at 732. The court of appeals also concluded that the single-business enterprise theory was a valid means of piercing the corporate veil to impose liability on CRS.

NPA and CRS filed petitions for review. NPA asserts that it did not have a general fiduciary duty to National Health under the Insurance Code's specific provisions, its general structure, or the parties' Agreement. NPA urges that, as prescribed by Insurance Code provisions governing third-party administrators, it owed National Health a fiduciary duty only in regard to holding premiums it collected, and National Health did not claim a violation of that duty.[4] NPA also concedes that

---

3. The jury also found that NPA failed to comply with the agreement, committed fraud against National Health, and misappropriated information regarding National Health's policyholders. But the jury did not find that National Health was damaged by those actions.

4. Under the Insurance Code in effect at the time of trial, premiums collected by a third-party administrator on behalf of an insurer were to be held in a fiduciary capacity. Act of May 27, 1989, 71st Leg., R.S., ch. 1094, 1989 Tex. Gen. Laws 4477, *repealed by* Act of May 20, 2003, 78th Leg., R.S., ch. 1274,

it owed National Health certain other specific fiduciary duties, but asserts that the Agreement limited the scope of those duties and its actions in connection with rolling policies to Hartford fell outside that scope. CRS claims that the single-business enterprise theory is not a basis for disregarding the corporate form.

## II. Fiduciary Duty

■ Whether a fiduciary duty exists is a question of law. *Meyer v. Cathey,* 167 S.W.3d 327, 330 (Tex.2005). Fiduciary duties are imposed on parties to certain relationships based on the special nature of the relationships. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex. 2002).

■ An agency relationship imposes certain fiduciary duties on the parties. *Id.* at 200. But even in an agency relationship such as employer-employee, courts take all aspects of the relationship into consideration when determining the nature of fiduciary duties flowing between the parties. For example, in *Johnson,* we considered the question of whether an associate lawyer at a law firm breached a fiduciary duty to his employer by referring a matter to another firm without obtaining a referral fee for his employer. We approved the Restatement (Second) of Agency in regard to the general duty of an agent: "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." *Id.* We adhere to that view. Unless otherwise provided by statute or law, duties owed by an agent to his or her principal may be altered by agreement. Accordingly, factors which must be taken into consideration when determining the scope of an agent's fiduciary duty to his or her principal include not only the nature and purpose of the relationship, but also agreements between the agent and principal.

### A. Insurance Code

■ The Legislature has, by statute, imposed fiduciary duties in some instances. *See, e.g.,* Tex. Fam.Code § 9.011 (providing that a fiduciary obligation is created when a party receives property that was awarded to a former spouse in a divorce decree); Tex. Ins.Code § 4053.106 (former Tex. Ins. Code art. 21.07–3) (funds held by managing general agents on behalf of an insurance company are held in a fiduciary capacity); Tex. Ins.Code § 4151.106 (former Tex. Ins.Code art. 21.07–6) (third-party administrator must hold premiums and other funds collected on behalf of an insurance company in a fiduciary capacity). The Insurance Code has modified common-law agency principles when necessary for the Code's purpose. *See Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 385 (Tex.2000) (noting that the Insurance Code specifically limits an agent's power to bind a company to a policy's terms). However, we disagree with the court of appeals that the Insurance Code imposes a statutory general fiduciary duty on third-party insurance administrators.

The court of appeals first concluded that NPA was an agent as the term was defined under the Insurance Code in effect at the relevant time. *See* Act of May 23, 1951, 52nd Leg., R. S., ch. 491, 1951 Tex. Gen. Laws 868, 1061–62, *repealed by* Act of May 20, 2003, 78th Leg., R. S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (former Tex. Ins.Code art. 21.02) ("Any person who solicits insurance on behalf of any insurance company ... or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company ... or

§ 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138

(former Tex. Ins.Code art. 21.07–6 § 17(a)).

who shall ... receive, or collect, or transmit any premium of insurance ... shall be held to be the agent of the company...."). The court then recognized that the Insurance Code specifies duties owed by third-party administrators to insurance companies: a third-party administrator may only provide services pursuant to a written agreement; a third-party administrator must carry a fidelity bond to protect against its acts of fraud or dishonesty; and a third-party administrator must hold premiums and other funds collected on behalf of an insurance company in a fiduciary capacity. *See* Act of May 27, 1989, 76th Leg., R. S., ch. 1094, 1989 Tex. Gen. Laws 4477, 4480–81, 4483, *repealed by* Act of May 20, 2003, 78th Leg., R. S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (former TEX. INS.CODE art. 21.07–6). The court held that the structure of statutes regulating agents generally, the scope of the statutes applicable to third-party administrators, and the agreement between NPA and National Health gave rise to a general fiduciary duty. 150 S.W.3d at 732.

We recognize that the Insurance Code in effect when this case was filed and appealed imposed certain specific fiduciary duties owed by various agents to insurance companies. As previously noted, funds held by managing general agents on behalf of an insurance company must be "held in a fiduciary capacity." Act of May 27, 1967, 60th Leg., R. S., ch. 757, 1967 Tex. Gen. Laws 2048, 2050, *repealed by* Act of May 20, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (former TEX. INS.CODE art. 21.07–3). On the other hand, premiums collected by a specialty license holder need not be treated "as money received in a fiduciary capacity" under certain circumstances. Act of May 30, 1999, 76th Leg., R.S., ch. 1530, 1999 Tex. Gen. Laws 5259, 5260, *repealed by* Act of May 20, 2003, 78th Leg., R. S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws

3611, 4138 (former TEX. INS.CODE art. 21.09). The article defining "agents" states that it does not authorize an agent to alter the terms of an insurance policy, but it does not otherwise specify duties of the agents. *See* Act of May 23, 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1061, *amended by* Act of May 9, 1985, 69th Leg., R.S., ch. 202, 1985 Tex. Gen. Laws 790, *repealed by* Act of May 20, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (former TEX. INS.CODE art. 21.02).

Even if we assume the Code provisions pertaining to agents generally also apply to third-party administrators, the Legislature clearly and specifically addressed certain fiduciary duties in the Code, yet it did not impose a general fiduciary duty on agents in general or on third-party administrators. It is neither an absurd nor an unjust result for the Legislature not to have imposed a general fiduciary duty on third-party administrators when the administrators are statutorily required to have a written contract with the party they serve as administrator. *See Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 356 & n. 20 (Tex.2004) (recognizing that the Court should not construe a statute in a way that leads to absurd results). The Legislature could have rationally presumed that parties to a written agreement, especially parties in a commercial setting bargaining in their own self interest, would set out their respective duties, obligations, and expectations in the agreement as did NPA and National Health.

We hold that the Insurance Code does not create a general fiduciary duty applicable to third-party administrators. And because we do not expand the meaning of statutes by implication, *see Sorokolit v. Rhodes,* 889 S.W.2d 239, 241 (Tex.1994), we also hold that the general structure of the Code does not create such a duty.

## B. The Contract

We next consider whether NPA had a general fiduciary duty under the common law. NPA asserts that any fiduciary duties were limited by the parties' agreement and urges us to adopt section 376 of the Restatement (Second) of Agency which states that the "existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties." RESTATEMENT (SECOND) OF AGENCY § 376 (1958). After NPA filed its brief, the Second Restatement was superceded by the Third Restatement. Section 376 of the Second Restatement does not appear verbatim in the Third Restatement, but the Third Restatement carries forward the principle that the parameters of an agency relationship are to be established by the agreement of the parties. According to the Third Restatement, "[a]n agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal." RESTATEMENT (THIRD) OF AGENCY § 8.07 (2006). "This section makes the basic point that an agent's duties of performance to the principal are subject to the terms of any contract between them." *Id.* cmt. a. The Restatement's position and our prior cases are consistent in respecting the right of persons to define the terms of their business relationships, *In re Prudential Insurance Co. of America,* 148 S.W.3d 124, 129 & n. 11 (Tex.2004), particularly sophisticated parties. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 180 (Tex.1997). We have also noted that common-law agency principles may be limited contractually, *Casteel,* 22 S.W.3d at 385, that a contractual obligation does not generally give rise to a fiduciary duty, *Johnson,* 73 S.W.3d at 203; *Manges v. Guerra,* 673 S.W.2d 180, 183 (Tex.1984), and that fiduciary duties are equitable in nature and generally not subject to hard and fast

rules. *Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 508 (Tex.1980). We agree with NPA that the extent of its duties to National Health should be considered in light of the parties' written contract.

The Agreement between NPA and National Health imposed several obligations on NPA. For example, NPA was to solicit potential insureds, receive and process applications, maintain accounting, administrative, and statistical records, and process and pay eligible claims. Under the contract, NPA controlled large amounts of information regarding the cancer policy book of business. The court of appeals noted that through its obligation to market National Health's product, NPA exercised control over the potential value of the business. 150 S.W.3d at 732. The court of appeals concluded that this extensive agreement, coupled with the Insurance Code, gave rise to a general fiduciary duty.

NPA admits that under certain contractual obligations it acted as National Health's agent and these obligations encompassed certain specific fiduciary duties. For example, NPA does not contest that it owed a fiduciary duty to act in National Health's interest when it processed and paid eligible claims, as it was required to do under the contract. But NPA claims that it only owed a fiduciary duty with respect to those specific obligations because, under the contract, NPA and National Health agreed that NPA "shall act as an independent contractor in the performance of responsibilities formed under this Agreement, and that [NPA's] services are not exclusive to National Health and that [NPA] will provide services to third parties." As previously stated, we agree that the substance of the agreement to act on behalf of a principal must be considered in determining the exact nature of the

relationship. *See Johnson*, 73 S.W.3d at 200; *see also Warner v. Winn*, 145 Tex. 302, 197 S.W.2d 338, 342 (Tex.1946) (holding that parties were not partners in a fiduciary relationship where they carefully defined the extent of their enterprise in a contract). The present Agreement did not provide that NPA would generally act on National Health's behalf in all matters connected with their relationship. There was no agreement that NPA would not market policies underwritten by other insurers in direct competition with National Health policies. To the contrary, National Health's witnesses acknowledged that they were not concerned with such activities by NPA so long as NPA produced certain premium levels for National Health. National Health entered into the relationship with NPA knowing that NPA had developed relationships and contracts with school districts and employers through a common-remitter program which gave it an advantage in marketing insurance products. NPA's relationships and marketing program were the primary attractions for National Health to enter its agreement with NPA.[5] There was no prohibition in the Agreement against rolling of policies by NPA, although both parties were aware of the practice in the industry and National Health's business for years had been in writing individual policies that lapsed and were replaced (or not) at the individual policyholder's choice.

A general fiduciary duty owed by NPA to National Health could have been breached by NPA's marketing policies for another insurance company without first submitting the applications to National Health, if the policies were similar to those underwritten by National Health and if sales of the policies produced premiums for other insurers. But National Health did not contract for such actions on behalf of NPA. The detailed Agreement specified just the opposite: NPA was an independent contractor whose activities in administering and marketing insurance products were not exclusive to National Health. We decline to impose a general fiduciary duty on NPA when the parties expressly agreed that NPA could take actions that would be in violation of such a duty. *See Warner*, 197 S.W.2d at 340, 342.

This was an arms-length business transaction. National Health was experienced in negotiating agreements in the insurance industry and was represented by experienced employees and by counsel when it entered the agreement. The parties agreed that NPA would act as National Health's agent only for specific purposes. We need not determine the exact fiduciary duties owed to National Health by NPA because jury question eight inquired only as to a general duty, which NPA did not owe.

■ National Health argues that NPA waived its claims that the contract limited

---

**5.** The advantages of NPA's program was described at trial by one of National Health's witnesses as follows:

Well, by having that common remitter would allow you to actually have almost an unlimited number of insurance companies or products, because they would be doing all the administration. And [Sommerlatte] had custom built or hand built kind of a home-grown system to be able to do that different than any other programs out there.

So what—he was using that as a marketing tool as an opportunity to go into school dis-

tricts and say, look, you're having to manage four or five or six different slots. We could consolidate that to one slot for you and we'll do a lot of that administrative expense.

That gives him a foot in the door that he wouldn't have any other way, but it also would now allow him to offer other products in addition to what they currently have. So in that case, he was using the third-party administrator as an opportunity to also promote product. And so you had a unique joining of the relationships there.

the scope of NPA's agency obligations because NPA failed to request an instruction in the jury charge regarding those limitations. NPA objected to the submission of the jury question on several grounds including the ground that it "does not adequately describe for the jury the basis of the fiduciary duty.... The question as phrased imposes a general fiduciary duty upon NPA that does not exist as a matter of law." NPA's argument on appeal is not that the jury question was defective, but that because NPA did not owe National Health a general fiduciary duty at all, the question should not have been submitted.

Whether a party owes a fiduciary duty is a legal matter. *Meyer,* 167 S.W.3d at 330. Because NPA did not owe National Health a general fiduciary duty, the question should not have been submitted, the question is immaterial, and it cannot support a judgment for National Health. *Salinas v. Rafati,* 948 S.W.2d 286, 288 (Tex.1997) (noting that a jury finding is immaterial if the question should not have been submitted); *Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex.1994). Even though it did so, NPA was not required to object to the immaterial question. *See Oliver v. Oliver,* 889 S.W.2d 271, 273–74 (Tex.1994).

### III. Conclusion

Because NPA did not owe National Health a general fiduciary duty, the question and the jury's answer are immaterial and cannot support a judgment. There are no other findings on which to base a judgment against NPA. Accordingly, we reverse the judgment of the court of appeals and render judgment that National Health take nothing from NPA. The judgment against CRS likewise must be reversed and rendered because it was based on NPA's liability. We do not reach the question of, and express no opinion on, whether the single-business enterprise theory is a viable doctrine to pierce the corporate veil of a party such as CRS.