# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00367-CV

**Craig Wheeler, Appellant**

v.

**Peter Sajovich; Nickolas Nowak; Austin Advantage, Inc. d/b/a
RE/MAX Austin Advantage; and eCounty Foreclosures, Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
## NO. D-1-GN-07-001535, HONORABLE GISELA D. TRIANA-DOYAL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Craig Wheeler appeals a final summary judgment on claims he asserted against Peter Sajovich, Nickolas Nowak, Austin Advantage, Inc. d/b/a RE/MAX Austin Advantage ("Austin Advantage"), and eCounty Foreclosures, Inc. ("eCounty") (collectively, appellees). In two issues on appeal, Wheeler argues that the district court erred in granting summary judgment because he presented evidence raising a fact issue as to elements of breach-of-fiduciary-duty and breach-of-contract claims he had asserted against appellees. We will affirm the judgment.

## BACKGROUND

The following facts are taken from the affidavits, depositions, and other evidence in the summary-judgment record. Appellant Wheeler became interested in purchasing property in Austin for investment purposes. Appellee Sajovich is a real estate investor who is a licensed

real estate broker. Appellee Austin Advantage is a real estate brokerage company. Sajovich is Austin Advantage's broker/owner. Appellee eCounty is an entity Sajovich formed to locate property for purchase at foreclosure sales, and he continues to serve as its president and owner. The company offers a group of investors the opportunity to purchase foreclosure properties at the monthly sales by having eCounty bid for the properties on their behalf. Appellee Nowak, at relevant times, worked at Austin Advantage as a licensed real-estate salesperson, operating under Sajovich's brokerage license. Nowak was also the assistant vice-president of eCounty.

Wheeler signed a brokerage agreement with Austin Advantage (the "Advantage Agreement") with an effective date of June 18, 2003 and a stated expiration date of the earlier of either December 18, 2003 or the closing of the last property transaction that Wheeler intended to acquire. The agreement was on a standard Texas Association of Realtors form entitled "Buyer/Tenant Representation Agreement–Residential." The Advantage Agreement provided that it was between Wheeler as the "Client" and Austin Advantage as the "Broker," and it was signed on behalf of Austin Advantage by Sajovich as "Broker/Associate."

Under the Advantage Agreement, Wheeler agreed:

- to "work exclusively through Broker in acquiring property in the market area [central Texas and surrounding counties] and [to] negotiate the acquisition of property in the market area only through Broker," and

- to "inform other brokers, salespersons, sellers and landlords with whom [he] may have contact that Broker exclusively represents [him] for the purpose of acquiring property in the market area and [to] refer all such persons to Broker."

Austin Advantage agreed:

- to "use [its] best efforts to assist [Wheeler] in acquiring property in the market area," and

- to "assist [Wheeler] in negotiating the acquisition of property in the market area."

The agreement also contained a provision in which Wheeler specifically acknowledged that Austin Advantage:

> may represent other prospective buyers or tenants who may seek to acquire properties that may be of interest to [Wheeler]. [Wheeler] agrees that Broker may, during the term of this agreement and after it ends, represent such other prospects, show the other prospects the same properties that Broker shows to [Wheeler], and act as a real estate broker for such other prospects in negotiating the acquisition of properties that [Wheeler] may seek to acquire.

Also, on June 7, 2003, Wheeler signed an agreement with eCounty[1] and subsequently signed addendums on July 24, 2003 and August 30, 2004 (collectively, the "eCounty Agreement"). Under the eCounty Agreement, if Wheeler wanted to bid in a monthly foreclosure auction, he would submit to Nowak or Sajovich in advance a list of properties he had selected, his maximum bid price, and his calculation of a brokerage commission he would owe under the agreement if the property was purchased. Wheeler then would deposit money equal to his maximum bid amounts plus brokerage commissions into eCounty's client account in exchange for a promissory note from

---

[1] This agreement was entitled "Addendum to Exclusive Buyer Representation Agreement Between RE/MAX Austin Advantage ("Broker") and Craig Wheeler ("Client")." Wheeler subsequently made a correction to one of the service options he had selected, which he signed and dated "6/25."

3

eCounty in an amount equal to his deposit with an annual interest rate of 5.00% per annum.[2] Nowak or another investment specialist (a licensed realtor working for Austin Advantage) would then attend the auction and bid on each property up to the maximum bid amounts Wheeler had specified. If the bid was successful, the property was purchased in eCounty's name using the money Wheeler had deposited in eCounty's account. Wheeler would then purchase the property or properties from eCounty, with Sajovich and Austin Advantage acting as the broker and receiving a commission on the sale. If the bid or bids were unsuccessful, Wheeler's money would be returned to him by eCounty. However, eventually, Wheeler testified, he would sometimes just leave his money in the eCounty account because "it became kind of cumbersome . . . to wire the money back and forth" every month.

The eCounty Agreement consisted of a form that provided a number of options from which Wheeler could choose regarding the services eCounty would provide him. Among the choices Wheeler made, he opted not to allow eCounty to use his funds to acquire for him non-foreclosure properties that were not on his bid list. Wheeler also testified that he never gave Nowak the ability to purchase property for him without Wheeler's instructions or permission before each auction.

The eCounty Agreement also disclosed that eCounty represented multiple clients at the auctions. The Agreement further disclosed, in a section titled "Representation and Conflict of Interest" that:

---

[2] The eCounty Agreement provided that "[i]nterest on the note shall not begin to accumulate until [Wheeler] provides written confirmation of [Wheeler's] intention to terminate the Earnest Money contract executed at the time [Wheeler's] bids are accepted."

1.  [Wheeler] hereby acknowledges that [he has] been notified the Designated Broker [defined as "Peter Sajovich, Broker/Owner, RE/MAX Austin Advantage"] is licensed by the Texas Real Estate Commission (TREC).

2.  [Wheeler] understands [Sajovich] represents eCounty Foreclosures, Inc.

3.  [Wheeler] understands that [Sajovich] is a key officer of eCounty Foreclosures, Inc.

4.  [Wheeler] understands [Sajovich] has financial interest in eCounty Foreclosures, Inc.

5.  [Wheeler] understands [Sajovich] may benefit financially from this transaction in addition to the brokerage commissions already stated.

Between June 2003 and mid-2006, eCounty bid on properties for Wheeler at approximately 10 monthly foreclosure auctions, and Wheeler ultimately purchased 4 of these properties through eCounty. Wheeler never purchased any properties through eCounty, Austin Advantage, Sajovich, or Nowak that were listed on the Multiple Listing Service (MLS) or that were not foreclosure properties.

Meanwhile, the Advantage Agreement's December 18, 2003 expiration date passed without Wheeler's signing a written agreement to renew or extend it. Nowak testified that he sent Wheeler another brokerage agreement to sign, but Wheeler never returned it. Although Wheeler acknowledged that he did not sign another brokerage agreement, he insisted that he and the appellees continued to "operat[e] on the understanding just like the original broker-client relationship we originally signed back in 2003." Wheeler insisted that Nowak understood that Wheeler and his

5

brother[3] were seeking to invest in non-foreclosure MLS properties, as well as foreclosure properties, and that Nowak would email them information regarding MLS properties. Nowak acknowledged that he continued to send MLS listings to Wheeler, as was his practice with all the investors with whom he worked.

The real-estate opportunity at issue here arose over the Fourth of July holiday weekend in 2006. Wheeler testified that he was out of town on vacation in New Mexico that weekend. At that time, Wheeler explained, he only had access to email on his home computer, not through any mobile device. On Saturday, July 1, 2006, at 1:14 p.m., Nowak sent an email to Wheeler and more than 20 other investors attaching the MLS listings for 2 fourplexes located on South 1st Street in Austin ("the South 1st Street properties"). The email described the properties as "Superb location in central Austin . . . [.] Rents should be $1000 per unit, $4000 monthly income[.] Properties will go under contract this weekend." Sajovich testified that he had emailed the information about the properties "to the people at Austin Advantage who specialize in finding investors . . . with the idea that they would quickly e-mail it to whoever they know that might be interested in—in purchasing an investment property to see if—if we could get an immediate response."

Sajovich further testified that after he had someone drive by the properties on the afternoon of July 1, and after none of the individuals to whom the property information had been emailed had responded to indicate their interest, he decided "to take the risk" and get the properties

---

[3] Wheeler's brother, Brent Wheeler, lived in Austin. Wheeler indicated that he and his brother had informally pooled their money and invested in property together. Brent Wheeler is not a party to the lawsuit.

under contract in eCounty's name using eCounty's corporate funds.  Sometime that day or Sunday, July 2, Sajovich transmitted an offer that included a $6,000 non-refundable option fee to the seller's agent.[4]  Along with his offer he sent an undated letter stating "[A]ttached is the full price offer we spoke about.  My client is obviously very interested in purchasing these fourplexes as indicated by the $3,000.00 nonrefundable four day option fee [for each building]. . . . I have also attached proof of funds for the down payment."  As proof of funds, he attached the first page of eCounty's March 1, 2006 - March 31, 2006 client-account bank statement, which showed the account balance and deposits from some customers—but no deposit from Wheeler.  eCounty used its corporate funds to pay the option fees and the earnest money for the properties.[5]  Sajovich testified that he did not know whose money would be used to close the purchase at the time he made the offer.  Sajovich testified that the seller's agent verbally informed him on Sunday, July 2, that eCounty's offer had been accepted by the seller, so he set up an inspection for Wednesday (Tuesday was the July 4th holiday) and received a signed acceptance from the seller on Wednesday, July 5.  Sajovich testified that "[s]ometime after we had it under contract, [I] started to formulate ideas on how best—best to structure this investment opportunity."  Soon after that, he began the process of preparing a joint-venture proposal, including putting together information about comparable properties, market conditions, and a cash-flow analysis.

---

[4]  Sajovich's recollection was that he sent the offer to the seller's agent on Saturday evening, July 1, and that the seller's agent told him verbally on Sunday, July 2, that his offer had been accepted.  The information reported to the MLS reflected a contract-pending date of July 3, 2006, and the checks for the option fees and earnest-money payments are also dated July 3, 2006.

[5]  The checks for these payments are drawn on an eCounty bank account with an account number that is different from the account number listed in the eCounty Agreement for pre-auction deposits.

7

Meanwhile, according to Wheeler, because he was out of town without email access, he did not see the July 1 email regarding the South 1st Street properties until July 3 or 4, "at a place with not very good phone service." Wheeler claimed that he called Nowak as soon as he could after that, "which would have been mid week . . . to ask him more about those properties." Nowak agreed that he and Wheeler first spoke about the properties on Wednesday, July 5. Wheeler could not remember any specific details from that conversation—he described this exchange as his "general information gathering" about the properties and their potential value as rental units or otherwise. Wheeler testified that he had about three conversations with Nowak about the properties before he visited Austin the following weekend to look at the properties.[6]

On Saturday, July 8, Wheeler drove by the properties on his own. Afterward, he met with Nowak and Sajovich at an Austin restaurant to discuss the properties. Although Wheeler and Sajovich had previously spoken by phone to discuss one of the foreclosure properties that Wheeler purchased through eCounty, the pair had never met in person. Sajovich proposed to Wheeler a joint venture on the property and gave him the written proposal that Sajovich had prepared. The proposal stated that "[b]oth buildings are under contract and are being offered for sale as a joint venture at the original purchase price of $450,000 each." Wheeler would be required to purchase the buildings with $180,000 cash and two new loans totaling $720,000 to close before July 28, 2006. Wheeler would also be required to provide a recorded 60-month option to Sajovich

---

[6] Sajovich testified that Nowak asked him on Thursday whether he would consider doing the joint venture with Wheeler. Sajovich thought the proposal would work well for Wheeler because Wheeler had a high income and the proposal could have beneficial tax implications for him. Wheeler testified that no one told him before he came to Austin to see the properties that the only way he would be able to purchase them was through a joint venture with Sajovich.

(or an entity controlled by him) for the sale of both buildings for $900,000 plus 50 percent of the net profits derived from converting the building to an 8-unit luxury condominium. In exchange, Sajovich would agree to obtain all necessary permits and construction loans and would manage the construction and sale of the condominium units. The proposal indicated that the anticipated sales price for each unit would average $225,000 with construction and improvement costs of not more than $30,000 per unit "resulting in a net profit to the investor of $258,000 or a 24% compounded return over a four year period for the initial $180,000 investment."[7] Wheeler testified that he wanted to think about Sajovich's proposal and that Sajovich told him he needed to make a decision by the following Monday, July 10, the next business day. Sajovich testified that he was headed to California on Monday, and needed to know whether Wheeler was going to participate in the joint venture before he presented the opportunity to other investors.

Wheeler testified that on the following Monday night, July 10, at about 6:00 or 7:00 p.m. Texas time, he contacted Sajovich about the joint-venture offer. Wheeler testified that he told Sajovich that he "was very interested in the property, but very concerned about the option contract that [he] had seen on Saturday, that that was unacceptable . . . ." Sajovich told him the deal was no longer available to him because Sajovich had already presented it to another investor. According to Sajovich, Wheeler said that he wanted Sajovich to sell him the property at the original listed price, and if he was unwilling to do that, Wheeler would file a complaint with the

_____

[7] None of the appellees ever offered the properties to Wheeler for the price for which the prior owner had listed them on the MLS.

9

Texas Real Estate Commission.[8]  Wheeler contacted Nowak by email on Tuesday after he talked to Sajovich.  Wheeler expressed surprise that the properties were not made available to him for purchase at the original list price. Nowak apologized and said that he thought that he had discussed the condo conversion and the profit split with Wheeler when they spoke on Thursday afternoon, that "the condo conversion was the intent all along," and that he thought Wheeler would be the perfect fit for this deal because it was a "risk-free opportunity to make between $150K-250K on a 2-3 year deposit of $150K."

Wheeler acknowledged that he and Nowak had discussed a condo conversion on Thursday, but testified that it did not involve a joint venture.  Wheeler testified that although Nowak never told him that he had the exclusive right to buy the properties and that neither Nowak nor Sajovich ever offered to sell him the properties for the list price of $900,000, he was under the impression that he was the person "in line to buy those properties."  He said Nowak "was maybe a little bit vague about maybe another investor being in place," but that before he came to Austin to look at the properties, Nowak told him "that investor or whoever he was talking about had fallen through."[9]  Wheeler testified that he thought that the properties were either still in the MLS or that "somehow they might have put a contract down already, some, either in my name somehow, or for the benefit of Craig Wheeler, or under eCounty, but it was my conclusion that I was coming down there and that those properties were available to me."

---

[8] Wheeler testified that he did file a complaint with the commission.  He acknowledged that neither Sajovich or Nowak were sanctioned.

[9] Nowak testified that he told Wheeler "it was under contract and I wouldn't be talking to him unless there was some way he could work on it."

Although Sajovich presented the proposal to at least four other sets of investors, none of them wanted to participate in the joint venture. On July 17, Sajovich informed the seller's agent that the funds for the property might be coming from one of eCounty's investors or they might come from a loan that Sajovich would put down in his own name and that he was willing to offer the seller an additional $5,000 per building to sign the amendment that would provide the disclosures required for him (as a licensed real-estate broker) to purchase as principal.[10] Sajovich closed on the properties on July 26, 2006 for a total purchase price of $910,000. After making some improvements, he sold them approximately ten months later for a sale price of $1,030,000.

Wheeler filed suit against the appellees, asserting causes of action for breach of contract, breach of fiduciary duty, and statutory fraud in connection with the South 1st Street properties. Wheeler sought damages for "the lost benefit of the bargain on opportunities improperly usurped by [the appellees]," attorney's fees, and exemplary damages, as well as equitable disgorgement of any profits and fees the appellees had obtained on the transactions.[11] The appellees answered and filed counterclaims against Wheeler for fraud, breach of contract, tortious interference with agreements, and defamation.

After discovery, the appellees filed a summary-judgment motion as to all of Wheeler's claims. The appellees contended there was no evidence as to any element of Wheeler's breach-of-fiduciary-duty claim, no evidence of an enforceable contract that could be a basis for Wheeler's breach-of-contract or statutory fraud claims, and no evidence of any injury or damages.

---

[10] The seller paid the brokerage commission to Austin Advantage on this transaction.

[11] Wheeler also sought an order compelling the appellees to sell him the South 1st Street properties at the original listed price.

11

Wheeler filed a response with evidence. Following a hearing, the district court granted the appellees' motion and ordered that Wheeler take nothing against any appellee. The appellees non-suited their counterclaims against Wheeler, and the district court rendered final judgment. Wheeler filed a motion for new trial, which was overruled by operation of law.

This appeal followed.

## ANALYSIS

In two issues, Wheeler appeals the district court's final order granting appellees' summary-judgment motion. In his first issue, Wheeler argues that the summary-judgment evidence raises fact issues as to each element of his breach-of-fiduciary-duty claim. In his second issue, Wheeler contends that the evidence raises fact issues as to each element of his breach-of-contract claim.

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A party moving for summary judgment must demonstrate that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985).

A no-evidence summary-judgment motion must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the nonmovant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment

12

is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch*, 118 S.W.3d at 751. We view the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id.* "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

When, as here, the trial court does not specify the basis for granting summary judgment, the appellant must demonstrate that each independent ground alleged is insufficient to support the judgment. *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

We begin by observing that appellees' summary-judgment challenge to evidence of damages is fatal to one of the two claims at issue on appeal. Wheeler, as noted, sought benefit-of-the-bargain damages in the form of lost profits "on opportunities improperly usurped by [appellees]." Generally speaking, whether a plaintiff has incurred any lost profits is determined by subtracting

13

a plaintiff's expenses from the gross profits the plaintiff would have earned under a contract had the defendant not breached. *See Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 884 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.). While there was evidence that one or more appellees had made a profit on the purchase and subsequent resale of the South 1st Street properties following their renovation, Wheeler did not present evidence from which a fact-finder could determine if *Wheeler* would have made any profits had he been able to purchase the South 1st Street properties. Wheeler indicated that his goal, unlike that of appellees, had been to purchase the properties and rent them, although he suggested that the opportunity for resale that appellees pursued "might have been mine." As far as the profits he would have made through rentals, Wheeler suggested only that he could have been able to obtain tax deductions related to the properties.[12] The record is simply devoid of evidence concerning the rental revenue Wheeler would earn, expenses, and related considerations that would enable the fact-finder to determine, with the requisite "'reasonable degree of certainty and exactness,'" whether Wheeler would have earned any profits on the properties. *See, e.g.*, *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,

---

[12] When asked to explain his damages, Wheeler testified:

Could there have been a significant opportunity to make several hundred thousand dollars? It's hard to say. I, I know that Peter bought those properties for one amount and sold them, I believe, for, for a much larger amount. That opportunity might have been mine. Over the long haul, it's, it's hard to calculate, but I've, I've lost a lot of money in deductions that I could have made on those properties. I guess it's been several years now. I would be probably two years into a 15-year loan on, on those properties. I'd be that much closer to owning these properties myself, which was my original goal.

14

877 S.W.2d 276, 279 (Tex. 1994) (quoting *Southwestern Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-99 (Tex. 1938)).

For this reason, the district court properly granted summary judgment as to Wheeler's breach-of-contract claim, and we need not address the parties' remaining contentions regarding that claim. We overrule Wheeler's second issue. However, because Wheeler also sought equitable disgorgement—a potential remedy for breach of fiduciary duty that does not require proof of actual damages, *see, e.g.*, *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)—we turn to whether Wheeler presented evidence raising a fact issue as to the other elements of his breach-of-fiduciary-duty claim, the focus of his first issue.

The elements of a breach-of-fiduciary-duty claim are: (1) the existence of fiduciary relationship, (2) a breach of duty by the fiduciary, and (3) resulting damage to the client or benefit to the fiduciary. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999); *see also Beck v. Law Offices of Edwin J. (Ted) Terry, Jr., P.C.*, 284 S.W.3d 416, 429 (Tex. App.—Austin 2009, no pet.). Whether a fiduciary duty exists is a question of law. *National Plan Admr's, Inc. v. National Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

A fiduciary relationship exists when a person is under a duty to give advice to or act for the benefit of another upon matters within the scope of the relationship. *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980); *Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex. App.—Houston [1st Dist.] 1993, writ denied). A fiduciary duty may arise from either a formal relationship, which is recognized as a fiduciary one by law or created by contract, or an informal relationship involving a high degree of trust and confidence. *See Moore*, 595 S.W.2d at 507-08.

15

Wheeler had relied on the asserted existence of a formal fiduciary relationship arising from the Advantage Agreement "and the conduct that arose from the contract." The Texas Supreme Court has recognized that an agency relationship is a type of formal relationship that gives rise to fiduciary duties. *See Johnson*, 73 S.W.3d at 199-200. On appeal, Wheeler contends that he had a fiduciary relationship with the appellees because "they were acting as real estate agents for him" and that "[i]n Texas, there is a clear fiduciary duty anytime one is acting as real estate agent[] and/or broker[]." *See Chien v. Chen*, 759 S.W.2d 484, 495 n.7 (Tex. App.—Austin 1988, no writ) ("A real-estate broker, in relation to his client, has many duties of disclosure and disinterested conduct that would not apply to him except that the law characterizes the relationship as a 'fiduciary relationship.'"). Wheeler also asserts that appellees were his agents because eCounty held money "in trust" for him at the time of the South 1st Street transaction and that this agency relationship gave rise to a fiduciary duty.

Wheeler asserts that the appellees breached their fiduciary duties as real-estate agents by securing a benefit for themselves at his expense. He contends that they did not comply with their duty to make no misstatements concerning the subject matter of the transaction and to fully and completely disclose to him all material facts that might affect him. Wheeler also contends that Sajovich improperly used the money in the eCounty client account as proof that he had sufficient funds for the down payment on the South 1st Street properties because Sajovich attached a page showing the account balance to his letter and offer to the seller's agent. The appellees respond that any agency relationship between Sajovich, Nowak, and Advantage and Wheeler was defined and limited by the Advantage Agreement and the eCounty agreement.

16

While an agency relationship imposes certain fiduciary duties on the parties, *Johnson*, 73 S.W.3d at 200, courts consider all aspects of the parties' relationship "when determining the nature of fiduciary duties flowing between the parties." *National Plan Admr's*, 235 S.W.3d at 700. Thus, when determining the scope of an agent's fiduciary duty to his principal, we must examine "not only the nature and purpose of the relationship, but also agreements between the agent and principal." *Id.*

A real-estate broker or salesperson is not a general agent. Instead, a real-estate broker or salesperson is a special agent whose authority is generally limited to the powers expressly conferred by the contract with the principal, which typically does not include authority to bind the principal to the terms of a sale. *Mecom v. Gallagher*, 213 S.W.2d 304, 306 (Tex. Civ. App.—El Paso 1947, no writ); *see also Joseph v. James*, No. 03-07-00197-CV, 2009 WL 2682608, at *3 (Tex. App.—Austin Nov. 6, 2009, no pet.) (mem. op.) (agent had no authority to make binding offer on behalf of principals).

In *Johnson*, the supreme court approved the Restatement (Second) of Agency's statement regarding the general duty of an agent that "'*[u]nless otherwise agreed*, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.'" 73 S.W.3d at 200 (emphasis added). Thus, the agent and principal may alter by agreement the duties owed by the agent to the principal, including the duty to act solely for the principal's benefit in agency-related matters. *National Plan Adm'rs, Inc.*, 235 S.W.3d at 700.

While the contractual agreement between the parties governs the scope of their agent-principal relationship and may limit the fiduciary duties owed to the principal, the supreme court

17

has held "that a contractual obligation does not generally give rise to a fiduciary duty . . . and that fiduciary duties are equitable in nature and generally not subject to hard and fast rules." *Id.* at 702. Here, assuming that the Advantage Agreement was still in effect at the relevant time, it explicitly limited the scope of the appellees' duties. Advantage (the defined "Broker") agreed to "use Broker's best efforts to assist Client [Wheeler] in acquiring property in the market area" and to "assist [Wheeler] in negotiating the acquisition of property in the market area." Wheeler agreed to exclusively use Advantage's services in acquiring and negotiating the acquisition of property in the market area. Wheeler also agreed to the "Competing Clients" provision, acknowledging that Austin Advantage:

> may represent other prospective buyers or tenants who may seek to acquire properties that may be of interest to [Wheeler]. [Wheeler] agrees that [Advantage] may, during the term of this agreement and after it ends, represent such other prospects, show the other prospects the same properties that [Advantage] shows to [Wheeler], and act as a real estate broker for such other prospects in negotiating the acquisition of properties that [Wheeler] may seek to acquire.

This language limited any fiduciary obligations that might otherwise have existed by virtue of the agency relationship created by the Advantage Agreement.[13]

Advantage, Sajovich, as Advantage's owner/broker, and Nowak, as Advantage's agent, had two duties to Wheeler under the Advantage Agreement—to use best efforts to help him locate property in the area to purchase and to assist him in negotiating the acquisition if he

---

[13] Although we do not understand Wheeler to be relying on the eCounty Agreement as the basis for the fiduciary duties he asserts here, this agreement was limited solely to purchases at foreclosure auctions, which are not at issue here and, in any event, explicitly recognized that appellees might profit from transactions.

18

determined that he wanted to make an offer on a particular property. As for the latter duty, it is undisputed that eCounty already had a contract pending on the South 1st Street properties several days before Wheeler first expressed to appellees an interest in even viewing the properties, much less purchasing them. Nor would the obligation to use "best efforts" to help Wheeler locate property for possible purchase, especially given the "Competing Clients" limitation, give rise to a fiduciary duty that could have been violated here.

In short, the appellees fulfilled any obligations to Wheeler here by notifying him when the South 1st Street properties were put on the market. And as mentioned above, any obligation to assist Wheeler with acquisition negotiations would not have arisen until after Wheeler indicated he wanted to make an offer on a property. We hold that there was no fiduciary duty that could have arisen by virtue of the Advantage Agreement that appellees would have violated here. *See National Plan Adm'rs, Inc.*, 235 S.W.3d at 703 ("The present Agreement did not provide that [the alleged agent] would generally act on [the alleged principal's] behalf in all matters connected with their relationship. . . . We decline to impose a general fiduciary duty on [the alleged agent] when the parties expressly agreed that [the alleged agent] could take actions that would be in violation of such a duty.").

Wheeler also argues that money that eCounty held in its client account at the time of the South 1st Street transactions gave rise to a fiduciary duty that has been breached. Assuming the existence of a fiduciary duty with respect to appellees' handling of his money, Wheeler alleges only one breach—that Sajovich used the first page of eCounty's March 1, 2006 - March 31, 2006 client-account bank statement, which showed the account balance, as proof of funds for the down payment

19

on the South 1st Street properties. While there was evidence that the eCounty client account included funds of Wheeler's when the South 1st Street properties were purchased in June, there is no evidence that the client account balance shown in eCounty's March bank statement that Sajovich used actually included any of Wheeler's funds, as opposed to funds of eCounty's other clients. Nor does Wheeler contend that appellees actually used any money he deposited with eCounty to fund the property purchase.

Wheeler also has presented no evidence that the appellees obtained any secret or unauthorized benefits because of their handling of the subject matter of the alleged agency. The Advantage Agreement disclosed the potential that the firm would show property to others that Wheeler might be interested in and that it would work as a broker for others. Also, despite Wheeler's allegations that the appellees breached their duty to not make misstatements about the subject matter of the transaction and to fully disclose all material facts that might affect him, he never explains what actionable misstatements the appellees made or what information they failed to disclose, and we find no evidence of any such misstatements or omissions in the record. Consequently, we find that there is no evidence of any fiduciary relationship with the appellees that was breached by their conduct related to the South 1st Street transaction. We overrule Wheeler's first issue.

**CONCLUSION**

Having overruled both of Wheeler's issues, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   June 23, 2010